THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, APPELLANT, v. BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, AND HOWARD H. KESTIN, DIRECTOR, OFFICE OF ADMINISTRATIVE LAW, RESPONDENTS, AND IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF NEW JERSEY, INTERVENOR.

THE SENATE OF THE STATE OF NEW JERSEY AND JOSEPH P. MERLINO, INDIVIDUALLY AND AS PRESIDENT OF THE SENATE OF THE STATE OF NEW JERSEY, APPELLANTS, v. BRENDAN BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY AND HOWARD H. KESTIN, DIRECTOR, OFFICE OF ADMINISTRATIVE LAW, RESPONDENTS, AND IRWIN I. KIMMELMAN, ATTORNEY GENERAL OF NEW JERSEY, INTERVENOR.

Argued May 4, 1982—Decided July 22, 1982.

*Leon J. Sokol* and *Lawrence T. Marinari, Jr.,* argued the cause for appellants (*Greenstone & Sokol* and *Marinari & Farkas,* attorneys; *Michael D. Solomon* and *Robert D. Farkas,* on the brief).

*Brendan T. Byrne, ad hoc* Counsel to the Governor, *Kenneth D. Merin,* Deputy Chief Counsel to the Governor and *Jack F. Trope,* Assistant Counsel to the Governor, argued the cause for respondent Brendan T. Byrne, Governor of the State of New Jersey (*W. Cary Edwards,* Chief Counsel to the Governor, attorney; *Kenneth D. Merin* and *Jack F. Trope,* of counsel; *Jack F. Trope* and *Doreen Stagnaro-Green,* on the brief).

*Irwin I. Kimmelman,* Attorney General of New Jersey, and *Michael R. Cole,* Assistant Attorney General, argued the cause for respondent Howard H. Kestin, etc. and intervenor (*Irwin I. Kimmelman,* attorney; *Richard M. Hluchan* and *William Harla,* Deputy Attorneys General, on the brief).

The opinion of the Court was delivered by

PASHMAN, J.

The General Assembly seeks a declaratory judgment that the Legislative Oversight Act, *L.* 1981, *c.* 27, *N.J.S.A.* 52:14B–4.1 to –4.9, is constitutional. The act allows the Legislature to veto by a concurrent resolution of both houses "[e]very rule hereafter proposed by a State agency," with certain limited exceptions. *N.J.S.A.* 52:14B–4.1, 4.4.

We hold that the legislative veto provision in the Legislative Oversight Act, *L.* 1981, *c.* 27, violates the separation of powers principle that "[t]he powers of the government shall be divided among three distinct branches," *N.J.Const.* (1947), Art. III, ¶ 1, by excessively interfering with the functions of the executive branch. The Legislature's power to revoke at will portions of coherent regulatory schemes violates the separation of powers by impeding the Executive in its constitutional mandate to faithfully execute the law. The legislative veto further offends the separation of powers by allowing the Legislature to effec-

tively amend or repeal existing laws without participation by the Governor. This process also contravenes the Presentment Clause requirement that changes in legislative policy be effected by a majority vote of both houses of the Legislature and approval by the Governor or, after executive veto, by a two-thirds vote of both houses. *N.J.Const.* (1947), Art. V, § 1, ¶ 14.

We emphasize both in this case and in *Enourato v. New Jersey Building Authority,* 90 *N.J.* 396 (1982), decided today, that not every action by the Legislature requires a majority vote of both houses and presentment to the Governor. Likewise, legislative cooperation with the Executive does not always unduly intrude upon the Executive's power to enforce the law. In many situations "responsibility is joint and governmental powers must be shared and exercised by the branches on a complementary basis if the ultimate governmental objective is to be achieved." *Knight v. Margate,* 86 *N.J.* 374, 389 (1981).

Nonetheless, the Court finds that the broad and absolute legislative veto provision in *L.* 1981, *c.* 27, is both an excessive intrusion into executive enforcement of the law and an unconstitutional mechanism for legislative policy making beyond the Governor's control. The Legislative Oversight Act thereby gives the Legislature excessive power both in *making* the laws and in *enforcing* them. This violates the separation of powers and the Presentment Clause.

I

The Legislative Oversight Act (Act), *L.* 1981, *c.* 27, *N.J.S.A.* 52:14B–4.1 to –4.9, became law on March 11, 1981, after both houses of the Legislature unanimously overrode Governor Byrne's veto. The Governor had vetoed three similar proposed amendments of the Administrative Procedure Act, *L.* 1968, *c.* 410, all of which sought to increase through legislative vetoes the Legislature's control over agency decision making. This fourth legislative attempt, *S*–1560, was originally passed on November 10, 1980, by a 38–0 vote in the Senate and a 63–0 vote

in the General Assembly. Governor Byrne vetoed the bill on January 13, 1981, declaring it unconstitutional. Subsequently, the Legislature easily mustered the constitutionally required two-thirds vote of both houses to override the Governor's veto. *N.J.Const.* (1947), Art. V, § 1, ¶ 14.

The Act requires submission to the Legislature of virtually every rule [1] proposed by any state agency. The President of the Senate and the Speaker of the General Assembly must immediately refer each proposed rule to a standing reference committee, *N.J.S.A.* 52:14B–4.1, which has 45 days to report its recommendation on the rule to the full membership of each house. *N.J.S.A.* 52:14B–4.2. A rule is deemed approved unless within 60 days of its receipt the Legislature adopts a concurrent resolution disapproving the rule. *N.J.S.A.* 52:14B–4.3. The Legislature has the option to adopt a concurrent resolution barring the rule from taking effect for an additional 60 days, during which time it can disapprove the rule through a concurrent resolution. *Id.*[2]

On March 10, 1981, the day before the Legislative Oversight Act became law, acting Attorney General Judith A. Yaskin submitted Formal Opinion No. 3–1981, which concluded that the act was unconstitutional and therefore had no force and effect upon any state agency. The following day, Governor Byrne informed all cabinet officers of the Attorney General's opinion and advised them to disregard the act in any rulemaking activities.

---

[1] The act does not apply to any "rule required by the Federal Government or because of an emergency affecting the public health, safety or welfare." *N.J.S.A.* 52:14B–4.4.

[2] The Act also creates a Joint Legislative Oversight Committee which, among its various powers, is authorized to "[r]eview existing rules in the manner provided in this act." *N.J.S.A.* 52:14B–4.6(c). It is unclear whether this was intended to authorize a legislative veto of rules in existence at the time of the Act's passage. In light of our holding invalidating the Act, we need not resolve this ambiguity.

On March 23, 1981, the Legislature passed a concurrent resolution, *ACR*–3024, which authorized the President of the Senate and the Speaker of the General Assembly to begin legal action to enforce the Legislative Oversight Act. On June 18, 1981 the General Assembly filed a complaint against Governor Byrne and Howard Kestin, Director of the Office of Administrative Law, in the Superior Court, Law Division, seeking a declaration that *L.* 1981, *c.* 27, is constitutional. The Senate filed a similar action on August 5, 1981. The Attorney General, acting as counsel for the defendants, filed answers to both complaints. The cases were consolidated pursuant to *R.* 4:38–1(a) and transferred to the Appellate Division pursuant to *R.* 2:2–3(a).

On December 3, 1981 the Appellate Division granted a motion to substitute Governor Byrne and Donald Linky, Counsel to the Governor, as attorneys for the Governor. That same day, the defendants moved this Court to certify the case directly pursuant to *R.* 2:12–1. We granted direct certification on March 26, 1982.

## II

### *Purposes of the Separation of Powers and the Presentment Clause*

The doctrine of separation of powers expresses a profound belief that the concentration of governmental power increases the potential for oppression, and that fragmentation of power helps ensure its temperate use. Our Constitution therefore gives certain powers to each branch of government to protect citizens from oppression by the other branches. Thomas Jefferson explained that "the powers of government should be so divided and balanced among several bodies ... that no one could transcend their legal limits, without being effectually checked and restrained by the others." Thomas Jefferson, *Notes on the State of Virginia*, 120 (W. Peden ed. 1955). The Framers therefore sought to prevent tyranny by constructing a government that could limit its own aggrandizement of authority.

The doctrine of the separation of powers was adopted by the Convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy. [*Myers v. United States,* 272 *U.S.* 52, 293, 47 *S.Ct.* 21, 85, 71 *L.Ed.* 160 (1926) (Brandeis, J., dissenting)]

The separation of powers does not require complete insulation of the branches from each other. Such a complete "hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Buckley v. Valeo,* 424 *U.S.* 1, 121, 96 *S.Ct.* 612, 683, 46 *L.Ed.*2d 659 (1976). As this Court has stated,

[T]he doctrine of the separation of powers was never intended to create, and certainly never did create, utterly exclusive spheres of competence. The compartmentalization of governmental powers among the executive, legislative and judicial branches has never been watertight. [*In re: Salaries Prob. Off. Bergen County,* 58 *N.J.* 422, 425 (1971)]

Nonetheless, the Framers created a government with three distinct branches, each a separate source of power that could check the abuses of the other branches. It has been the constitutional role of the Court to prevent any of the branches from exercising illegitimate power over the others. *Marbury v. Madison,* 5 *U.S.* (1 Cranch) 137, 2 *L.Ed.* 60 (1803).

Our State Constitution has a clause that explicitly provides for the separation of powers. Art. III, ¶ 1 reads:

The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

This clause expressly provides for separation of state powers in the same way that the Federal Constitution separates the branches of the federal government. Speaking for a unanimous Court, Justice Handler explained recently in *Knight v. Margate, supra,*

It is a constitutional axiom that each branch of government is distinct and is the repository of the powers which are unique to it; the members or representatives of one branch cannot arrogate powers of another branch. The constitutional spirit inherent in the separation of governmental powers contemplates that each branch of government will exercise fully its own powers without trans-

gressing upon powers rightfully belonging to a cognate branch. Each branch of government is counseled and restrained by the constitution not to seek dominance or hegemony over the other branches. [86 *N.J.* at 388]

The Framers sought to establish a government of separated and balanced powers primarily because they feared "that in a representative democracy the Legislature would be capable of using its plenary lawmaking power to swallow up the other departments of the Government." *Consumer Energy Council of America, Etc. v. Fed. Energy Reg. Comm'n*, 673 *F.2d* 425, 464 (D.C.Cir.1982) (hereinafter "*Consumer Energy*"). As the Supreme Court noted in *Buckley v. Valeo, supra*,

the debates of the Constitutional Convention, and the Federalist Papers, are replete with expressions of fear that the Legislative Branch of the National Government will aggrandize itself at the expense of the other two branches. [424 *U.S.* at 129, 96 *S.Ct.* at 687 (footnote omitted)].

While 200 years of our history has somewhat diminished the fears expressed then, the concerns of the Framers were based on principles that remain vital and valid. No concentration of power offers greater potential for abuse than the ability to both make and enforce the law. Blackstone warned the British Parliament of this danger before the American Revolution.

In all tyrannical governments, the supreme magistracy, or the right both of *making* and of *enforcing* the laws, is vested in one and the same man, or one and the same body of men; and wherever these two powers are united together, there can be no public liberty. The magistrate may enact tyrannical laws, and execute them in a tyrannical manner, since he is possessed, in quality of dispenser of justice, with all the power which he, as legislator, thinks proper to give himself. [1 W. Blackstone, *Commentaries* at 146–47 (T. Cooley ed. 1899) (emphasis in original)]

Preserving a less autocratic government through separated powers requires the courts to enforce the Constitution's restraints on two distinct forms of legislative power. First, the Courts must preserve the constitution's constraints on the Legislature's power to *make* the laws. Second, the courts must prevent legislative incursions into the Executive's power to *enforce* the laws.

■ One important element of the scheme of separated powers is the Executive's authority to faithfully execute the laws

passed by the Legislature. *N.J.Const.* (1947), Art. V, § 1, ¶ 1. Any legislative action which excessively interferes with the Executive's ability to carry out this constitutional mandate violates the separation of powers under Article III.

Another significant constitutional element of the separation of powers is the executive veto of legislation. It not only restrains legislative interference with executive enforcement of the law, but also conditions and restricts the Legislature's power to make new laws. Hamilton recognized both purposes, explaining that the executive veto

not only serves as a shield to the Executive, but it furnishes an additional security against the enaction of improper laws. It establishes a salutary check upon the legislative body, calculated to guard the community against the effects of faction, precipitancy, or of any impulse unfriendly to the public good, which may happen to influence a majority of that body. [*The Federalist No. 73* at 476–77 (R. Luce ed. 1976)]

The State Constitution's Presentment Clause, Art. V, § 1, ¶ 14, like that in the Federal Constitution, *U.S.Const.*, Article I, § 7, prevents the exercise of law-making power without the concurrence of both houses of the Legislature and approval by the Executive, unless the Legislature can muster a two-thirds majority vote of both houses to override the executive veto. The 1776 New Jersey Constitution did not contain an executive veto. However, the 1844 Constitution adopted an executive veto to curb illegitimate legislative power. *See* Proceedings: *New Jersey Constitutional Convention of 1844* at 175–204 (N.J. Writers' Project ed. 1942). After former Governors testified at the 1947 Constitutional Convention about the need to increase the Governor's veto power, *see* Proceedings: *New Jersey Constitutional Convention of 1947*, Vol. V at 66, 461, the delegates expanded the executive veto into its present form.

The New Jersey Constitution's Presentment Clause now reads:

Every bill which shall have passed both houses shall be presented to the Governor. If he approves he shall sign it, but if not he shall return it, with his objections, to the house in which it shall have originated.... If upon reconsideration, ... two-thirds of all the members of the house of origin shall agree to pass the bill, it shall be sent, together with the objections of the Governor, to the

other house, by which it shall be reconsidered and if approved by two-thirds of all the members of that house, it shall become a law .... [*N.J.Const.* (1947), Art. V, § 1, ¶ 14]

■ Any legislative action that so removes the Governor from law making as to violate the Presentment Clause, Art. V, § 1, ¶ 14, threatens the separation of powers. Art. III, ¶ 1. To determine whether legislative action violates either clause, the Court must bear in mind the two purposes of both provisions: preventing unwarranted legislative interference with the executive branch and excessive legislative law-making power. In a scheme of government that frequently requires cooperation between the branches of government, *see Knight v. Margate*, 86 *N.J.* at 388, 431 *A.2d* 833, we cannot decide what constitutes excessive legislative power merely by intoning the abstract principles of separation of powers. To judge the constitutionality of the legislative veto provision in *L.* 1981, *c.* 27, *N.J.S.A.* 52:14B–4.3, the Court must determine its practical effects upon law making and law enforcement. We now proceed to that task.

## III

A. *Legislative veto as excessive intrusion into law enforcement.*

■ The veto provision in the Legislative Oversight Act, *L.* 1981, *c.* 27, violates the constitutional separation of powers. By allowing the Legislature to control agency rulemaking, the legislative veto can gravely impair the functions of agencies charged with enforcing statutes. The extremely broad legislative veto in the Oversight Act thereby frustrates the Executive's constitutional mandate to faithfully execute the law.

■ "[T]he function of promulgating administrative rules and regulations lies at the very heart of the administrative process." *Cammarata v. Essex Cty. Park Comm'n*, 26 *N.J.* 404, 410 (1958). *See also Abelson's Inc. v. N.J. State Board of Optometrists*, 5 *N.J.* 412, 423 (1950). Rulemaking allows the agency to further

the policy goals of legislation by developing coherent and rational codes of conduct "so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance," *Boller Beverages Inc. v. Davis*, 38 *N.J.* 138, 152 (1962). We have recognized that administrative agencies are the arms of the executive branch of government through which it executes the laws passed by the Legislature. Agencies regulate through their delegated power to promulgate rules and regulations. *See In re Administrative Rules*, 90 *N.J.* 85 (1982).

In their effects on private conduct, the types of commands embodied in executive rules may not differ greatly from those in many statutes. For example, the Casino Control Act, *N.J.S.A.* 5:12–1 to –152, embodies legislative commands far more detailed than the administrative regulation of most industries. However, "apart from whether power is inherently executive or legislative, once [the Legislature] has delegated by law a task to the executive, it cannot interfere . . . in the performance of that task." Cooper & Cooper, *The Legislative Veto and the Constitution*, 30 *Geo.Wash.L.Rev.* 467, 488 (1962).

Even where the Legislature is not using its veto power to effectively change the law, the veto can illegitimately interfere with executive attempts to enforce the law. The chief function of executive agencies is to implement statutes through the adoption of coherent regulatory schemes. The legislative veto undermines performance of that duty by allowing the Legislature to nullify virtually every existing and future scheme of regulation or any portion of it. The veto of selected parts of a coherent regulatory scheme not only negates what is overridden; it can also render the remainder of the statute irrational or contrary to the goals it seeks to accomplish. "[L]egislative interference, constant in its potentiality, can be exercised in any given case without a change in the general standards the legislature has initially decreed." *Chadha v. Immigration and Naturalization Service*, 634 *F.*2d 408, 432 (9th Cir. 1980), *cert.* granted, 454 *U.S.* 812, 102 *S.Ct.* 87, 70 *L.Ed.*2d 81 (1981).

Moreover, the Legislature need not explain its reasons for any veto decision. Its action therefore leaves the agency with no guidance on how to enforce the law.

Broad legislative veto power deters executive agencies in the performance of their constitutional duty to enforce existing laws. Its vice lies not only in its exercise but in its very existence. Faced with potential paralysis from repeated uses of the veto that disrupt coherent regulatory schemes, officials may retreat from the execution of their responsibilities. They will resort to compromises with legislative committees aimed at drafting rules that the current Legislature will find acceptable. In federal agencies an increased reliance on low visibility negotiations with congressional oversight committees apparently has occurred.[3] This process "violates two fundamental standards for informal rulemaking: reasoned decision making based on a record and the opportunity for public participants to contest opposing presentations." Bruff & Gellhorn, "Congressional Control of Administrative Regulation: A Study of Legislative Vetoes," 90 *Harv.L.Rev.* 1369, 1413–14 (1977).

> In effect, Congress is able to expand its role from one of oversight . . . to one of shared administration. . . . Congress gains the ability to direct unilaterally . . . the exercise of agency discretion in a specific manner considered undesirable or unachievable when the enabling statute was first passed. [*Consumer Energy*, 673 *F.*2d at 474]

We are not called upon to determine whether every form of legislative veto or oversight intrudes excessively into the executive sphere of law enforcement. We deal only with the all-inclusive veto presented in this case. In other contexts legislative cooperation or sharing of powers may be essential to further a statute's purpose. Under appropriate circumstances, the Legislature can cooperate with the Executive without violating the separation of powers. *See Enourato v. N.J. Building Authority*, 90 *N.J.* 396 (1982).

---

[3]In fact, *L.* 1981, *c.* 27, established a Joint Legislative Oversight Committee authorized to "[n]egotiate with and offer recommendations to the agenc[ies] concerning revisions in . . . rule[s]." *N.J.S.A.* 52:14B–4.7(a)(4).

> Inevitably some osmosis occurs when the branches of government touch one another; the powers of one branch sometimes take on the hue and characteristics of the powers of the others. [*Knight v. Margate*, 86 *N.J.* at 388]

However, legislative veto power cannot stand where it allows "an assumption by one branch of powers that are central or essential to the operation of a coordinate branch." *Chadha*, 634 *F.*2d at 425. Moreover, "[i]f an exercise of functions which lie at the center of another branch is attempted on a long-term and routine basis, a violation of the constitutional rule requiring separation of powers is more easily established." *Id.* The legislative veto provision in *L.* 1981, *c.* 27, applies to virtually every rule proposed by any executive agency in the State. Because this particular veto provision sweeps so broadly, it allows the Legislature to interfere with essential executive branch rule-making functions "on a long-term and routine basis," *Chadha*, 634 *F.*2d at 425, thereby violating the separation of powers.

B. *Legislative veto as excessive law-making power.*

The legislative veto gives the Legislature unlimited potential to block any rules promulgated pursuant to a particular statute. The Legislature can use this power to exert a policy-making effect equivalent to amending or repealing existing legislation. A veto which effectively amends or repeals existing law offends the Constitution because it is tantamount to passage of a new law without the approval of the Governor. This violates the separation of powers, *N.J.Const.* (1947), Art. III, ¶ 1, and the Presentment Clause, Art. V, § 1, ¶ 14. As we have pointed out, such use of the veto also interferes with the Executive's constitutional responsibility to execute the law.

We have previously described the limits on legislative power in the absence of presentment to the Governor. *In re N.Y., Susquehanna & Western R.R. Co.*, 25 *N.J.* 343 (1957). In that case the Board of Public Utility Commissioners had before it a rail carrier's application for permission to discontinue passenger service. While the application was pending, the Legislature

passed a concurrent resolution declaring a policy against further curtailment of such service. The commissioners denied the application, finding themselves obliged to yield to the Legislature's concurrent resolution. The Court reversed:

It is perfectly clear the Concurrent Resolution is not an act of legislation ∴... The resolution here involved is a concurrent one, and of course was never submitted to the Governor for his action. Except within the precincts of the Legislature, or perhaps where it acquires force by virtue of some specific statute, a concurrent resolution is ordinarily an expression of sentiment or opinion, without legislative quality of any coercive or operative effect. [*Id.* at 348]

*N.Y., Susquehanna* supports the proposition that no legislative action may have substantial policy-making effects without the approval of the Governor or a two-thirds vote of both houses of the Legislature. The unlimited power to foreclose agency action granted to the Legislature in *L.* 1981, *c.* 27, allows it to nullify enabling legislation or to redirect its application as if the statute had been amended or repealed. Such law making replaces duly enacted statutes with laws made in contravention of the Constitution's required procedures. It allows precisely what the separation of powers was intended to forbid, the "propensity of the legislative department to intrude upon the rights, and to absorb the powers, of the other departments," *The Federalist No. 73* at 476 (R. Luce ed. 1976) (Hamilton), and the nullification of the executive veto's "salutary check upon the legislative body, calculated to guard the community against the effects of faction, precipitancy, or of any impulse unfriendly to the public good." *Id.* at 477.

For precisely these reasons, in *Consumer Energy, supra*, the D.C. Circuit Court of Appeals held that the congressional veto of Federal Energy Regulatory Commission (FERC) ratemaking rules was an exercise of legislative power that violated the federal Constitution's presentment clause in Article I, § 7. The Natural Gas Policy Act of 1978, 15 *U.S.C.* § 3301 to 3342, directed FERC to implement an "incremental pricing" program to shift part of the price increases resulting from natural gas deregulation from residential users to industrial users. The House of Representatives vetoed Phase II of FERC's rules,

which expanded the program to a broad category of industrial plants. The federal appeals court rejected the position of congressional *amici* that use of the veto was not congressional law making, but rather a refusal to enact *proposed* legislation, which of course the Legislature can always do without presentment to the executive.

> We emphatically reject this position, and hold that the veto of the Phase II rule effectively changed the law by altering the scope of FERC's discretion and preventing an otherwise valid regulation from taking effect. Accordingly, the Senate's concurrence and presentation to the President were necessary prerequisites to the effectiveness of the disapproval resolution. [673 *F*.2d at 465]

The Court described at some length the extent to which the congressional veto of FERC's incremental pricing plan effected a change in policy. This change was prompted by legislative reassessments and new political pressures. The court's description of the veto's policy-making function and statement of its constitutional infirmity are worth repeating:

> The 1980 debates in the House make clear that the policy embodied in Title II and in the Phase II rule was being re-evaluated in light of the limited experience under Phase I and the economic conditions that had developed since 1978. Representative Preyer commended the "vigorous rejection of a theory overrun by reality," Representative Stockman stated that "our purpose today is simply to lay to rest by the agency of legislative veto a dubious regulatory experiment that has been overtaken by the rush of events and unanticipated developments," and Representative Gramm added that "every argument that has been made . . . against phase II is equally applicable to phase I." Congressional amici themselves admit that in vetoing the rules the House was making "a social policy judgment," an "assessment that is peculiarly legislative in nature" because it is a "predictive assessment, using public participation and collective decisionmaking, with democratic accountability as the final test of judgment." The only thing missing from this description is the crucial fact that the Congress had already made one judgment on this policy problem, and had agreed to allow FERC to formulate a rule that would go into effect without further congressional action. In taking its "second look" at the problem, Congress undeniably engaged in a reconsideration of its previously enacted policy.
>
> This is precisely the kind of decision that the Constitution envisions will be made only by both houses with the participation of the President through his veto power. The President and both houses of Congress agreed on a policy when they took their "first look." Undoing this policy requires adherence to the same procedure. [673 *F*.2d at 468 (footnotes omitted)]

Two state high courts have rejected similar legislative veto schemes in declaring the exercise of such power to violate those

states' separation of powers and presentment clauses. In *State ex rel. Barker v. Manchin*, 279 *S.E.*2d 622, 632 (W.Va.1981), the West Virginia Supreme Court of Appeals stated that

> The power of the ... legislative body to sustain or to reverse such [agency] actions either by concurrent resolution or by inertia, constitutes a legislative veto power comparable to the authority vested in the Governor, as head of the Executive Department, by W.Va.Const. art. VII, § 14, and reverses the constitutional concept of government whereby the Legislature enacts the law subject to the approval or the veto of the Governor.

The Alaska Supreme Court reached the same result in *State v. A.L.I.V.E. Voluntary*, 606 *P.*2d 769, 779 (1980).

We also reject the argument that the Act is constitutional merely because it was passed in accord with Presentment Clause requirements. The Legislature cannot pass an act that allows it to violate the Constitution. The Court rejected a similar argument in *Inganamort v. Borough of Fort Lee*, 72 *N.J.* 412 (1977). There a municipality attempted to extend by resolution a duly enacted rent control ordinance that had provided for its own extension by the passage of a resolution. We held that the extension of a rent control ordinance was legislation that could not take effect without the public notice and participation required to enact a municipal ordinance. The borough could not enact an ordinance allowing it to make future laws in violation of required law-making procedures.

> The [municipality's] argument would allow it to accomplish indirectly what it had no power to do directly. Clearly, the duration of the regulation involved an important aspect of the legislative judgment and should be subject to the same procedural safeguards which were required to attend the passage of the rent measure in the first instance. [*Id.* at 420]

Similarly, the Legislature cannot circumvent the constitutional requirement of presentment to the Governor merely by passing a statute which allows such a procedure.

Government survives only if individuals guide themselves according to its laws. By restraining the Legislature's ability to make, amend and revoke the law, the Presentment Clause adds stability and certainty that are essential in any law-abiding society.

The internal effects of a mutable policy are ... calamitous. It poisons the blessing of liberty itself. It will be of little avail to the people, that the laws are made by men of their own choice, if ... [they] undergo such incessant changes that no man, who knows what the law is to-day, can guess what it will be to-morrow. Law is defined to be a rule of action; but how can that be a rule, which is little known, and less fixed? [*The Federalist No. 62* at 406 (R. Luce ed. 1976) (Hamilton or Madison)].

A recent study of congressional use of the legislative veto reveals that it is often used to alter existing legislation without presentment to the President. Such use is tempting because it avoids the more difficult, but constitutionally required, process of amendment or repeal.

In all the programs [examined in the study] except ... [one], there was repeated major legislation during the period under study. Congress could have used such legislation to resolve issues that had emerged in rulemaking programs subject to legislative vetoes. Whether for reasons of indecision or deadlock, however, it ordinarily chose to leave these issues open in the revised statutes and to rely on the legislative veto mechanism to maintain control over agency policy initiatives. [Bruff & Gellhorn, 90 *Harv.L.Rev.* at 1409–10 (footnotes omitted).

We recognize that some applications of the veto provision in the Legislative Oversight Act, *L.* 1981, *c.* 27, would further statutory schemes of cooperation between the legislative and executive branches, rather than altering or frustrating the enforcement of statutory policy. However, it is not necessary for the Courts to hypothesize about every conceivable use of the Oversight Act's veto provision. The all-inclusive veto provision in *L.* 1981, *c.* 27, gives the Legislature the potential to disregard at will the constitutional scheme of checks and balances in exercising policy-making power. This violates both the separation of powers and the Presentment Clause.

## IV

Administrative agencies are an aspect of American government that has dramatically altered the scheme envisioned by the Framers of our Constitution. Faced with increasingly complex social and economic problems, legislatures have focused their efforts upon making broad policy determinations, delegating to executive agencies extensive power to implement those policies through rules and quasi-judicial proceedings. Some observers

describe administrative agencies as a fourth branch of government.

Many agency regulations differ little in their scope and effect from legislative commands. Yet, in our system of government, the Legislature and not the Executive must make the law. Administrative agency power derives solely from a grant of authority by the Legislature. The Legislature has the power to limit that scope of authority or even abolish it.

To control agency action without limiting or abolishing executive authority, the Legislature can "appoint any commission, committee or other body whose main purpose is to aid or assist it in performing its functions." Art. IV, § 5, ¶ 2. The Legislature can appoint such oversight committees, and the committees themselves can function, without presentment to the Governor and in many cases by the vote of less than a majority of both houses. In *Buckley v. Valeo, supra*, the Supreme Court held that functions of "an investigative and informative nature" can be performed by a commission of legislatively appointed officers, because the powers fall "in the same general category as those powers which Congress might delegate to one of its own committees." 424 *U.S.* at 137, 96 *S.Ct.* at 691. Of great relevance to this appeal, the Supreme Court distinguished between congressional investigation, which is "a necessary and appropriate attribute of the power to legislate," *id.* at 138, 96 *S.Ct.* at 691, citing *McGrain v. Daugherty,* 273 *U.S.* 135, 174, 47 *S.Ct.* 319, 328, 71 *L.Ed.* 580 (1927), and rulemaking, which "represents the performance of a significant governmental duty exercised pursuant to a public law." *Id.* at 141, 47 *S.Ct.* 319. The Court held that Congress could not appoint members of the Federal Elections Commission if the commission performed rulemaking and adjudication, because "[t]hese administrative functions may . . . be exercised only by persons who are 'Officers of the United States.'" *Id.*

Beyond oversight through legislative committees, there is some additional room for legislative input into the execution of

laws. Certain types of legislative participation create only a minimal danger of the aggregation of power in the legislative branch which the separation of powers seeks to prevent. This is particularly true where the Executive has extensive control pursuant to a statutory delegation of authority and the Legislature has only limited power to reject discrete projects rather than entire schemes of regulation.

In *Brown v. Heymann*, 62 *N.J.* 1 (1972), this Court upheld the constitutionality of the Executive Reorganization Act, which authorized the Governor to prepare an executive reorganization plan and present it to both houses of the Legislature. The statute provided that the plan would take effect unless both houses passed a concurrent resolution within 60 days disapproving the plan. The Court noted the plaintiffs' Presentment Clause claim but did not discuss it, focusing instead on the claim that by delegating too much legislative authority the act unconstitutionally *increased the power of the executive* branch. The Governor did not challenge the Legislature's veto power.

The Federal executive has also generally supported executive reorganization plans that take effect unless the Legislature votes a resolution of disapproval. *See Consumer Energy*, 673 *F.* 2d at 458–59; 43 Op. Att'y Gen. 2 (Jan. 31, 1977) (Attorney General Bell) ("the procedures provided in . . . the reorganization statute are constitutionally valid").[4]  *But see* 37 Op. Att'y

---

[4]Similarly, in *Atkins v. United States*, 556 *F.*2d 1028 (1977), *cert.* den. 434 *U.S.* 1009, 98 *S.Ct.* 718, 54 *L.Ed.*2d 751 (1977), the Court of Claims upheld a legislative veto provision in the Federal Salary Act of 1967, 2 *U.S.C.* §§ 351 to 361, pursuant to which the President's recommendations for judicial pay increases become effective unless vetoed by either house of Congress. The court noted that by disapproving the President's recommendations Congress "is certainly not making new law," *id.* at 1063, and by approving the salary changes they "become effective, just as if a majority in each House had concurred in them and the President approved them (which of course can be assumed in light of his role initiating them)," *id.* at 1064.

The Court of Claims in *Atkins* further noted that the "matter of salaries [is] traditionally within the peculiar province of the legislative branch, not impinging upon presidential functions or veto rights." *Id.* at 1063. *Atkins*

Gen. 56 (1933) (Attorney General Mitchell) ("power to disapprove administrative acts, raises a grave question as to the validity of the entire provision in the . . . Executive reorganization [statute]").

"[G]overnmental powers must be shared and exercised by the branches on a complementary basis if the ultimate governmental objective is to be achieved." *Knight*, 86 *N.J.* at 389. In some of these areas the legislative veto might serve an important function consistent with the separation of powers. However, we cannot allow the Legislature to create oversight mechanisms that will circumvent the constitutional procedures for making laws and interfere unduly with the Executive's constitutional responsibility to enforce them.

Our holding here does not foreclose all legislative veto provisions. Where legislative action is necessary to further a statutory scheme requiring cooperation between the two branches, and such action offers no substantial potential to interfere with exclusive executive functions or alter the statute's purposes, legislative veto power can pass constitutional muster.

The remarkably broad veto power in *L.* 1981, *c.* 27, offers almost unlimited potential for law making without the constitutionally required participation of the Governor and for undue interference with the executive branch. For these reasons, we hold that the Act violates the separation of powers and the Presentment Clause.

## V

The Legislative Oversight Act is unconstitutional. It violates the separation of powers by giving the Legislature excessive

thus suggests that control over the appropriations process is another area in which additional legislative oversight is appropriate and may sometimes proceed without the participation of the Governor.

The constitutional power of the Legislature in overseeing its own appropriations is discussed more fully in *Enourato v. New Jersey Building Authority, supra,* decided today.

power to impede the Executive in its constitutional mandate to faithfully execute the law. Further, the Act permits the Legislature to effectively amend or repeal existing laws without the participation of the Governor. Foreclosing the Governor from the law-making process offends the separation of powers and the Presentment Clause. This is an exercise of legislative power that the Constitution forbids.

CLIFFORD and SCHREIBER, JJ., concurring in the result.

*For invalidation*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER and HANDLER—5.

*Opposed*—None.