JUSTICE SOLOMON, concurring in part and dissenting in part.
I join the majority and agree that a court may reverse the Legislature's invalidation of an agency rule or regulation pursuant to the Legislative Review Clause (the Clause). I dissent because the Constitution gives the Legislature the power to invalidate such rules or regulations under limited circumstances: when the challenged rule or regulation is inconsistent with the "intent of the legislation as expressed in the language of the statute which the rule or regulation is intended to implement."
*681 N.J. Const. art. V, § 4, ¶ 6. The majority's analysis has broadened those limited circumstances and allowed the Legislature to invalidate executive action based on the "legislative spirit" of the Civil Service Act, N.J.S.A. 11A:1-1 to 12-6 (CSA or the Act), and not the legislative intent "as expressed in the language of" that Act. The majority's analysis thus threatens the constitutional balance of power among New Jersey's co-equal branches of government and impermissibly **547 expands the power granted to the Legislature by the voters when they approved the Clause.
I.
A.
The Clause allows "the Legislature [to] review any rule or regulation to determine if the rule or regulation is consistent with the intent of the Legislature as expressed in the language of the statute which the rule or regulation is intended to implement." N.J. Const. art. V, § 4, ¶ 6. It is important to understand the Clause's evolution and the reasoning behind its careful wording.
In January 1977, the General Assembly Speaker recommended the establishment of the Assembly Legislative Oversight Committee (the Committee) in part "to review administrative rules and regulations to ascertain whether the executive department, agency or authority promulgating the rules or regulations is faithfully executing the intent of the Legislature in its grant of statutory authority to issue such rules or regulations." Legislative Oversight Comm., Gen. Assembly, Eye on the Executive 1 (Dec. 1977), http://www.njleg.state.nj.us/legislativepub/reports/executive.pdf(citation omitted). Later that year, the Committee issued its report entitled, Eye on the Executive (the report), which recommended that "the legislature should be empowered to permanently veto such rules if they are found to be unreasonable, arbitrary, capricious, inconsistent with legislative intent, or beyond the scope of the agency's authority." Id. at 34 (emphasis omitted). The report recognized "legislative intent" as the threshold to review rules promulgated and implemented by executive agencies. See id. at 16 (prescribing post-auditing and review of expenditures to determine if rules are in accord with legislative intent); id. at 19 (requiring that committees "devote greater attention to an explanation of their intent when approving legislation" as means of "pre-oversight" and noting that "[t]he lack of clear intent (and confusion as to language) in many pieces of legislation stands as **548 the most common criticism of the Legislature from Executive agencies").
Thereafter, the Legislature drafted legislation consistent with the recommendations of the Committee. A. 2323 (1978) required agencies to submit "a statement of either the terms or substance of the intended action or a description of the subjects and issues involved" to the Legislature and provided that they could proceed with the action unless that action should be disapproved by a majority vote of each House within sixty days of submission. And S. 1026 (1978) provided for a similar ability to disapprove agency action by concurrent resolution of both Houses within ninety days of submission. Governor Byrne pocket vetoed both A. 2323, see Governor's Statement on Filing A. 2323 Unsigned (Mar. 3, 1978), and S. 1026, see Governor's Statement on Filing S. 1026 Unsigned (Feb. 26, 1980).
Iterations proposed in 1980 and 1981 would have provided the Legislature with wide latitude to review whether an administrative "rule is adequate, proper, timely, appropriate, necessary, reasonable, equitable, understandable, consistent with legislative intent, in accord with judicial findings, and within the scope of the promulgating agency's authority." S. 1560 (L. 1981, c. 27); S. 1203 (1980). Governor Byrne, who found those proposals to be an unconstitutional encroachment by the Legislative Branch upon the Executive, vetoed both bills. Governor's Veto Statement to S. 1560 (Jan. 13, 1981); Governor's Veto Statement to S. 1203 (Sept. 22, 1980).
The General Assembly unanimously overrode the Governor's veto of S. 1560 (L. 1981, c. 27), and we were asked to decide the law's constitutionality. In General Assembly v. Byrne, we found that it was overly broad and "[gave] the legislature unlimited potential to block any rules," without the Governor's signature, 90 N.J. 376, 388, 448 A.2d 438 (1982), thereby violating the Separation of Powers and Presentment Clauses of our Constitution, id. at 396.
**549 *682 Next, the Legislature moved for "Legislative Disapproval of Rules and Regulations" to be added to the New Jersey Constitution through two proposed ballot questions that each would have "authoriz[ed] the Legislature to prohibit proposed administrative rules and regulations from taking effect and to invalidate existing rules and regulations." Sen. Con. Res. 107 2 (May 14, 1984); S. Con. Res. 133 2 (July 22, 1982). The interpretive statement that was to appear before the voters posited that "[t]he Legislature has the duty to review [agency-issued] rules and regulations to see if they carry out the intention of the Legislature as contained in law and if they are efficient and effective." Ibid.
Again the courts intervened, finding the statement "highly misleading" to the voters. Kimmelman v. Burgio, 204 N.J. Super. 44, 54, 497 A.2d 890 (App. Div. 1985). The Appellate Division explained that
[t]he difficulty with the statement is that while it appears to indicate the amendment involves only a routine housekeeping matter, somehow furthering a power the Legislature already has, its real purpose is an attempt to limit the application of the separation of powers and presentment clauses of the constitution, fundamental clauses of great importance. Thus the amendment may reasonably [be] said to be intended to alter the basic relationship between the executive and legislative branches of government.
[ Ibid. ]
Emphasizing that voters must recognize what they have been asked to do, the Appellate Division suggested a rewrite of the interpretive statement and allowed the measure to appear on the ballot in the 1985 General Election. Id. at 54-55, 497 A.2d 890. The voters overwhelmingly rejected the amendment by a twenty-five percent margin. See Public Question No. 7 (1985), http://www.njelections.org/election-results/1985-public-questions.pdf.
Seven years later, in 1992, as the culmination of a fifteen-year effort by the Legislature to acquire the right of legislative review of executive action, the voters approved the measure currently before this Court. A. Con. Res. 199 (2013) (enacted). The language of the successful amendment contains a narrow veto power permitting only the invalidation of a rule deemed inconsistent with **550 legislative intent "as expressed in the language of the statute." N.J. Const. art. V, § 4, ¶ 6.
The history of the substantial contraction of the Clause before it was finally passed reinforces the limited review power provided for in the plain language of the Clause and underscores that the standard against which the Legislature may measure administrative action is the legislative intent "as expressed in the language of the statute," and not the more nebulous "legislative spirit" of an enactment. Looking beyond the text of a statute -- for example, looking to its "legislative spirit" -- would exceed the constitutional authority granted to the Legislature by the amendment and would grant the Legislature a power that was rejected by Governor Byrne, our courts, and our voters.
Nevertheless, the resolution currently before us presents the Legislature's findings as to the Job Banding Rule in the following terms:
The proposed new Job Banding Rule, N.J.A.C. 4A:3-3.2A, is contrary to the spirit, intent, and plain meaning of the provision in the New Jersey Constitution that requires that promotions be based on merit and fitness to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive.
....
*683 The proposed new rule is not consistent with the intent of the Legislature as expressed in the language of the Civil Service Act, including the spirit, intent, or plain meaning of N.J.S.A. 11A:3-1, N.J.S.A. 11A:4-1, N.J.S.A. 11A:4-8 or N.J.S.A. 11A:5-7.
[A. Con. Res. 199 (2013) (enacted) (emphases added).]
To the extent that the Legislature relied on the purported "spirit" of the CSA, and not exclusively on the legislative intent "as expressed in the language of the statute," in determining to strike down the Job Banding Rule, the Legislature exceeded its authority under Article V, Section 4, Paragraph 6 of the New Jersey Constitution. We therefore turn to the language of the CSA to properly determine whether the regulations proposed by the Commission are inconsistent with "the language of the statute" on its own, absent impermissible extraneous considerations.
**551 II.
Under the Legislative Review Clause, the Legislature was entitled to consider whether the Civil Service Commission's Job Banding Rule was inconsistent with the legislative intent of the CSA "as expressed in the language of the statute."
A.
The Job Banding Rule "facilitates advancement appointments of qualified employees to the next higher title level within a job band when a vacancy exists." N.J.A.C. 4A:3-3.2A(a). A job band is "a grouping of titles or title series into a single broad band consisting of title levels with similar duties, responsibilities, and qualifications," 45 N.J.R. at 507, and movement from a lower to a higher title within a job band is considered an "advancement appointment," N.J.A.C. 4A:3-3.2A(c). The question is whether such intra-band advancement procedures conflict with the legislative intent as expressed in language of the CSA.
Under the regulations, job bands have multiple title levels within which movement to a higher level is considered an advancement. N.J.A.C. 4A:3-3.2A(c). In choosing whether titles are appropriate for job banding, and consistent with the Commissioner's authority "to establish the procedures by which merit-based appointments are to be made," In re Foglio, 207 N.J. 38, 44, 22 A.3d 958 (2011), the Commissioner determines "whether a movement from one position to a higher level position may be achieved based on an evaluation of relative knowledge, skills, and abilities without resorting to competitive examination procedures, while still satisfying the State Constitutional and statutory mandate for merit and fitness in selections and appointments," N.J.A.C. 4A:3-3.2A(b)(1).
In practice, eligible employees being considered for advancement endure a multifaceted and competitive examination of their skills and attributes. Although the regulation indicates that advancement is possible "without resorting to competitive examination procedures," it is clear in context that the regulation proposes **552 to bypass only competitive written examinations, not all competitive examinations.
First, the job banding regulation establishes predetermined competencies for a position and notifies all of those in the next lower level of the opportunity to apply. N.J.A.C. 4A:3-3.2A. The job banding regulation further provides that the appointing authority "shall conduct an advancement appointment selection process" -- a competitive *684 examination process.[1] Ibid. The appointing authority then decides which candidates "may" receive an advanced appointment, and, finally, the candidates are ranked and the appointments are announced. Ibid. (emphasis added).
Nothing in the Job Banding Rule conflicts with the legislative intent of the CSA as expressed in its language. The CSA governs civil service employment in New Jersey, including all positions within state government and those within the political subdivisions that choose to adopt and be governed by the CSA. See N.J.S.A. 11A:2-11(e). It was enacted to effectuate the mandate of Article VII, Section 1, Paragraph 2 of the New Jersey Constitution that "[a]ppointments and promotions in the civil service of the State, ... be made according to merit and fitness to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive." See Foglio, 207 N.J. at 52, 22 A.3d 958. Our courts have explained the requirements for advancement of state employees classified by title; as the Appellate Division noted in this case, "the appointment and promotions of the civil service of New Jersey must be made based on merit and fitness except if **553 impracticable." Commc'ns Workers of Am. v. Civil Serv. Comm'n, 447 N.J. Super. 584, 605, 149 A.3d 844 (App. Div. 2016).
The CSA likewise affirms that "[i]t is the public policy of this State to select and advance employees on the basis of their relative knowledge, skills and abilities" and the "adequacy of their performance." N.J.S.A. 11A:1-2(a), (c). And, in keeping with the constitution's preference for competitive examinations, the CSA calls for competitive examinations to be used when hiring and promoting civil service employees. N.J.S.A. 11A:4-1.
The Job Banding Rule provides for "promotions" "based on merit and fitness," and is therefore in harmony with the legislative intent of the CSA "as expressed" in its "language" as a general matter. It is therefore appropriate to consider whether any particular aspect of the job banding regulations conflicts with the legislative intent of the CSA as expressed in any of its component provisions.
B.
The Legislature struck down the Commission's Job Banding Rule as inconsistent with the CSA, "including N.J.S.A. 11A:3-1, N.J.S.A. 11A:4-1, N.J.S.A. 11A:4-8 or N.J.S.A. 11A:5-7." A. Con. Res. 199 (2013) (enacted). I consider each point of purported conflict in turn.
1.
To implement the hiring and advancement policies that undergird the CSA, the Act explicitly delegates certain powers to the New Jersey Civil Service Commission (the Commission). The CSA confers upon the Commission the authority to "assign and reassign" and to "consolidate and abolish titles." N.J.S.A. 11A:3-1. In particular, the CSA states that the Commission shall:
*685 a. Establish, administer, amend and continuously review a State classification plan governing all positions in State service and similar plans for political subdivisions;
b. Establish, consolidate and abolish titles;
**554 c. Ensure the grouping in a single title of positions with similar qualifications, authority and responsibility;
d. Assign and reassign titles to appropriate positions; and
e. Provide a specification for each title.
[Ibid. (emphasis added).]
Therefore, the authority to classify or abolish positions and the metrics by which they are filled are expressly delegated to the Commission. Furthermore, Title 11 of the CSA gives the Commissioner the authority to "adopt and enforce rules to carry out this title and to effectively implement a comprehensive personnel management system." N.J.S.A. 11A:2-6. Accordingly, the Commissioner is authorized "to establish the procedures by which merit-based appointments are to be made." Foglio, 207 N.J. at 44, 22 A.3d 958.
Nothing "expressed in the language of [ N.J.S.A. 11A:3-1 ]" bars job banding; indeed, the Job Banding Rule would seem to fall within the Commission's delegated ability to consolidate titles and to group positions within a title.
2.
N.J.S.A. 11A:4-1, in relevant part, instructs the Commission to provide for:
a. The announcement and administration of examinations which shall test fairly the knowledge, skills and abilities required to satisfactorily perform the duties of a title or group of titles. The examinations may include, but are not limited to, written, oral, performance and evaluation of education and experience;
b. The rating of examinations;
c. The security of the examination process and appropriate sanctions for a breach of security;
d. The selection of special examiners to act as subject matter specialists or to provide other assistance.
Under the statute, competitive examinations may range from written and oral tests to performance or education and experience evaluations provided that they "fairly test" the preparedness of applicants to fulfill the functions of a particular job "title or group of titles." Ibid.
**555 Indeed, under subsection (a) of N.J.S.A. 11A:4-1, the CSA grants the Commission wide latitude in determining the nature of competitive examination it will use to assess qualifications for appointment and advancement, and nowhere does it prohibit the non-written yet still rigorous "evaluation of relative knowledge, skills, and abilities" provided for in Section 4A:3-3.2A(b)(1) of the job banding regulations. In short, nothing "expressed in the language of [ N.J.S.A. 11A:4-1 ]" prohibits job banding.
3.
The Legislature claims and the majority agrees that the job banding regulation "eliminates the statutory certification and appointment procedure prescribed by the [CSA], directly contradicting [its] language." Ante at 528, 191 A.3d at 669. N.J.S.A. 11A:4-8 provides that
[t]he commission shall certify the three eligibles who have received the highest ranking on an open competitive or promotional list against the first provisional or vacancy. For each additional provisional or vacancy against whom a certification is issued at that time, the *686 commission shall certify the next ranked eligible. If more than one eligible has the same score, the tie shall not be broken and they shall have the same rank. If three or more eligibles can be certified as the result of the ranking without resorting to all three highest scores, only those eligibles shall be so certified.
A certification that contains the names of at least three interested eligibles shall be complete and a regular appointment shall be made from among those eligibles. An eligible on an incomplete list shall be entitled to a provisional appointment if a permanent appointment is not made.
Eligibles on any type of reemployment list shall be certified and appointed in the order of their ranking and the certification shall not be considered incomplete.
Nowhere in the job banding regulation is N.J.S.A. 11A:4-8's "Rule of Three" process countermanded -- or even mentioned. Applicants are notified of an advancement opportunity, examined, selected, and ranked. N.J.A.C. 4A:3-3.2A. That does not prevent application of the "Rule of Three" process. It does not alter or supersede the statute. See Morton v. 4 Orchard Land Tr., 362 N.J. Super. 190, 198, 827 A.2d 352 (App. Div. 2003) ("We are mindful that when a regulation conflicts with a statute, the regulation is void as a matter of law.");
**556 In re Terebetski, 338 N.J. Super. 564, 571, 770 A.2d 756 (App. Div. 2001) ("[A] regulation cannot supersede or alter a statute.").
Further, the "Rule of Three" is self-contained and does not purport to occupy the entire field of appointment and promotion determinations. Although the rule must be followed, nothing in the statute precludes the adoption of additional, supplementary procedures. And "nothing expressed in the language of [ N.J.S.A. 11A:4-8 ]" would prohibit the supplementary procedures set forth in the Job Banding Rule.
4.
The final section of the CSA with which the Legislature has found the job banding regulations to conflict is N.J.S.A. 11A:5-7, which provides that "whenever a veteran ranks highest on a promotional certification, a nonveteran shall not be appointed unless the appointing authority shall show cause before the board why a veteran should not receive such promotion."
The Job Banding Rule also contains a veterans' preference:
Once an appointing authority determines which eligible employees are interested, it shall conduct an advancement appointment selection process approved by the Chairperson or designee and make a determination as to which employee or employees may receive an advancement appointment. The appointing authority shall then rank the candidates for the announced advancement appointment and document same, taking into account the veterans' preference described in (d)3i and ii below, where applicable.
i. Whenever a veteran ranks highest in the advancement appointment selection process, a nonveteran shall not be appointed unless the appointing authority shows cause before the Civil Service Commission why the veteran shall not receive the advancement appointment.
ii. When the advancement appointment selection process results in a tie between a veteran and a nonveteran, the veteran shall be offered the advancement appointment.
[ N.J.A.C. 4A:3-3.2A(d)(3)(i) to (ii).]
Not only does the regulation not conflict with the statutory veterans' preference, but it uses the statutory language verbatim and adds a non-conflicting provision *687 for ties. In short, nothing "expressed in the language of [ N.J.S.A. 11A:5-7 ]" prohibits the veterans' preference established in the job banding regulations. **557 C.
In sum, the job banding regulation is consistent with the Constitution and the "intent" of the CSA "as expressed in [its] language," N.J. Const. art. V, § 4, ¶ 6, both in a general sense and in its particulars. The Job Banding Rule does not clash with the constitutional mandate for merit- and fitness-based hiring and promotion that undergirds the CSA. See N.J. Const. art. VII, § 1, ¶ 2 ; N.J.S.A. 11A:1-2(a), (c) ; Foglio, 207 N.J. at 52, 22 A.3d 958. Although job banding changes the traditional format of competitive examination used to assess merit and fitness, it does so within statutory and constitutional bounds. Had the Legislature intended to limit competitive examinations to written examinations, it would have said so. Instead, the CSA allows the Commissioner to devise multi-faceted competitive examinations so long as they "test fairly the knowledge skills and abilities" of an applicant. N.J.S.A. 11A:4-1. Similarly, the Act does not forbid the adoption of procedures to supplement the "Rule of Three," N.J.S.A. 11A:4-8, or the veterans' preference, N.J.S.A. 11A:5-7. And job banding in no way conflicts with the delegation of responsibility for job classification schemes to the Commission. N.J.S.A. 11A:3-1.
Given the absence of conflict between the language of the statute and the stricken regulation, it appears that the Legislature relied on its view of the "spirit" of the CSA -- and not the Act's intent as expressed in its plain language -- to strike down the Job Banding Rule. In allowing it to do so, the majority has permitted the Legislature to exceed its constitutional authority.
III.
"Words make a difference." In re Plan for the Abolition of the Council on Affordable Hous., 214 N.J. 444, 470-71, 70 A.3d 559 (2013). By allowing the Legislature to rely upon the perceived "spirit" of the CSA, the majority expands legislative authority and reduces executive authority in a manner that threatens to undo the balance of powers established by Article III, Paragraph 1, and Article V, Section 1, Paragraph 14 of the State Constitution.
**558 The constitutional balance among branches of government is integral to our fundamental organic law. Knight v. Margate, 86 N.J. 374, 387-88, 431 A.2d 833 (1981). It is a constitutional axiom that each branch of government is distinct and serves as the repository of the powers unique to it; the members or representatives of one branch cannot arrogate the powers of another branch. Id. at 388, 431 A.2d 833.
Co-equal branches of government exist to safeguard from fears "that in a representative democracy the Legislature would be capable of using its plenary lawmaking power to swallow up the other departments of the Government." General Assembly, 90 N.J. at 383, 395, 448 A.2d 438 (citations omitted). "Each branch of government is counseled and restrained by the constitution not to seek dominance or hegemony over the other branches." Knight, 86 N.J. at 388, 431 A.2d 833. "[T]he taking of power is more prone to abuse and therefore warrants an especially careful scrutiny." Commc'ns Workers of Am. v. Florio, 130 N.J. 439, 457, 617 A.2d 223 (1992).
When it overturned the Legislative Oversight Act in GeneralAssembly, this Court stated, "we cannot allow the Legislature to create oversight mechanisms that will circumvent the constitutional procedures for making laws and interfere unduly *688 with the Executive's constitutional responsibility to enforce them." 90 N.J. at 395, 448 A.2d 438. By allowing the Legislature to divine the "spirit" of legislation to invalidate job banding, this Court now allows that which it warned against twenty-five years ago in General Assembly. The nearly half century of legislative attempts to achieve the power to review administrative action confirms the significance of the phrase "as expressed in the language of the statute." N.J. Const. art. V, § 4, ¶ 6. By improperly applying our standard of review here, the majority alters the balance of powers upon which our government rests.
IV.
For the reasons set forth above, I concur in the majority's stated standard of review but dissent because, here, the majority **559 improperly applies that standard of review, and expands the Legislative Review Clause to allow the Legislature to divine the "legislative spirit" of the CSA.

On March 10, 1981, the Attorney General issued a Formal Opinion to Counsel to the Governor, Daniel O'Hern, opining that the Legislative Oversight Act was unconstitutional. Specifically, the Opinion advised that the Act's provisions concerning the means for effectuating the new legislative veto power constituted acts that were equivalent to legislation. From that determination, the Opinion reasoned that the Act's provisions were inconsistent with state constitutional requirements for the passage of legislation and for the presentment of the same to the governor for his review and approval. The Attorney General advised the Governor's Counsel that the administrative agencies of state government should be directed not to conform their rulemaking activities to the law's requirements on its effective date.