NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2231-08T2
            A-3837-09T2
            A-3400-10T2

IN THE MATTER OF AUTHORIZATION FOR
FRESHWATER WETLANDS STATEWIDE GENERAL
PERMIT 6, SPECIAL ACTIVITY TRANSITION
AREA WAIVER FOR STORMWATER MANAGEMENT,
WATER QUALITY CERTIFICATION, AND
ACCESS WAIVER FOR GENERAL PERMITS.

_____

IN THE MATTER OF CARE ONE, INC.

_____

IN THE MATTER OF AUTHORIZATION FOR
FRESHWATER WETLANDS STATEWIDE
GENERAL PERMIT 6.  (Revised or
Modified Permit).

_____

| APPROVED FOR PUBLICATION |
| --- |
| December 11, 2013 |
| APPELLATE DIVISION |

Argued March 12, 2013 — Decided September 9, 2013

Before Judges Fisher, Waugh, and Leone.

On appeal from the New Jersey Department of
Environmental Protection, 1103-07-0007.1.

R. William Potter argued the cause for
appellants Residents for Enforcement of
Existing Land Use Code, Susan Tierney, and
Pond Run Watershed Association (Potter and
Dickson, attorneys; Mr. Potter, on the
briefs).

Jill Denyes, Deputy Attorney General, argued
the cause for respondent New Jersey
Department of Environmental Protection
(Jeffrey S. Chiesa, Attorney General,

attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Denyes, on the brief).

Richard M. Hluchan argued the cause for respondent Care One, Inc. (Hyland Levin LLP, attorneys; Mr. Hluchan, of counsel; Robert S. Baranowski, Jr., on the brief).

Nicholas B. Patton argued the cause for amici curiae, Delaware Riverkeeper and Delaware Riverkeeper Network (Mr. Patton and Jane P. Davenport McClintock, on separate briefs.)

The opinion of the court was delivered by

WAUGH, J.A.D.

In these consolidated actions, appellants Residents for Enforcement of Existing Land Use Code, Susan Tierney, and the Pond Run Watershed Association appeal several administrative decisions by respondent New Jersey Department of Environmental Protection (Department) in connection with its grant of a general freshwater wetlands permit and transition area waivers to respondent Care One, Inc. (CareOne), which seeks to expand its assisted living facility in Hamilton Township. We dismiss the appeal in Docket No. A-3400-10 as interlocutory. We affirm the administrative agency action in Docket No. A-3837-09, and reverse the administrative agency actions in Docket No. A-2231-08. Finally, we remand for further proceedings consistent with this opinion.

I.

We discern the following facts and procedural history from the record on appeal.

In 1999, the Department granted CareOne a freshwater wetlands permit to fill 0.97 acres of isolated wetlands and to create a stormwater management basin, also known as a detention basin,[1] for construction of an assisted living facility on approximately seven acres in Hamilton Township, Mercer County. The facility, known as CareOne at Hamilton, is located on the northern corner of the intersection of Cypress Lane and Whitehorse-Hamilton Square Road. A 0.47 acre portion of the permitted area was left undisturbed.

In 2007, CareOne wanted to construct a two-story, 62,259 square foot addition, as well as a paved parking lot. The proposed construction would require the filling of the existing detention basin and other wetlands on the site, and the construction of a new, L-shaped detention basin along Cypress Lane.

_____

[1] "'Detention basin' . . . means a human-made impoundment area made by constructing an embankment, or excavating a pit, or both, for the purpose of temporarily storing stormwater." N.J.A.C. 7:7A-1.4.

A-2231-08T2

In April, CareOne submitted a combined application for a "Letter of Interpretation" (LOI) to delineate the site's freshwater wetlands and a "Freshwater Wetlands Statewide General Permit No. 6" (GP6), see N.J.A.C. 7:7A-5.6, to fill the undisturbed segment of the land covered by the 1999 permit, or 21,800 square feet (0.5 of an acre) of freshwater wetlands, and to disturb an additional 35,906 square feet (0.82 of an acre) of the adjoining transition area.[2]

According to CareOne, the nearest waterway to the site is Pond Run. The affected onsite wetlands were isolated and of intermediate resource value, requiring an adjacent transition area of fifty feet. No bog turtle populations would be impacted and "no flood hazard permit was required," because no activities were proposed within the flood hazard area or riparian zones.

CareOne's application package contained, among other documents: (1) a March 2007 "Statement of Compliance" by its licensed professional engineers, Taylor Wiseman & Taylor (TWT), which included a "Freshwater Wetlands Delineation Report"; (2) grading and groundwater recharge plans, maps, soil boring logs, vegetative and hydrological analyses, photographs, and a

---

[2] N.J.S.A. 13:9B-3 defines "transition area" as "an area of land adjacent to a freshwater wetland which minimizes adverse impacts on the wetland or serves as an integral component of the wetlands ecosystem."

description of the onsite vegetative species; (3) two stormwater management reports by TWT dated March 2007, "Drainage and Detention Calculations," and "Detention Facilities Operation and Maintenance Manual"; and (4) a March 2007 preliminary and final site plan. CareOne also provided the required notice of its project to Hamilton Township and landowners within 200 feet of the site. The Department published notice of the applications in the DEP Bulletin on May 2, 2007.

In March 2008, CareOne responded to the Department's request for additional information by submitting (1) hydrographs, including inflow and outflow hydrographs of the existing and proposed basins for the two-, ten-, twenty-five-, and hundred-year storms; (2) calculations and diagrams for two recharge areas, one each in the front and rear of the building, showing that they both would drain within the Department's required seventy-two-hour limit; (3) existing and proposed flow charts, and drainage area and grading maps; (4) a February 2008 revision of TWT's "Drainage and Detention Calculations"; and (5) a February 2008 revision of TWT's "Detention Facilities Operation and Maintenance Manual."

CareOne's proposed stormwater management plan included (1) the new detention basin designed to meet the two-year, ten-year, and hundred-year storm flow estimates and to "dry out"

within the seventy-two-hour time limit required by the Department; (2) two recharge areas with VortSentry® treatment devices to manage stormwater quality by removing the total suspended solids (TSS) in any runoff within 17.3 hours; (3) two "StormChambers" to meet infiltration or groundwater recharge estimates; and (4) an "Emergency Spillway" that would convey any flows from a hundred-year storm.

While the Department's staff was reviewing CareOne's application and submissions, CareOne applied to the Hamilton Township Zoning Board of Adjustment (Zoning Board) for use and site plan approvals and bulk variances for its project. On June 9, 2009, the Zoning Board voted to deny CareOne's request for site plan approval with bulk variances. The decision is not in the record. CareOne did not appeal the Zoning Board's denial.

In a May 8, 2008 internal "Engineer's Report for SWM [stormwater management] review," the Department's staff recommended "approval," concluding that "[t]his project is in conformance with all of the engineering aspects of the Stormwater rules." The staff also (1) determined that the "[o]verall proposed land disturbance is more than 1 acre and new impervious area is more than 1/4 acre, therefore review of stormwater management was required for this project"; (2) found that CareOne's submitted Nonstructural Strategies Points System

6                                                    A-2231-08T2

(NSPS) spreadsheet had been "completed correctly"; (3) "accepted" CareOne's calculations that its proposed TSS removal plans of an extended detention basin and two water quality treatment devices to treat any runoff from the new parking lot and sidewalks, and from the pre-existing impervious area, would remove approximately seventy-four percent of TSS; (4) noted that CareOne had proposed two recharge chambers, or bio-retention swales, to provide the required recharge volume within seventy-two hours; and (5) found that stormwater flows would be "further reduced due to Bio[s]wales."[3] Finally, the staff approved the drawings that CareOne had submitted, including CareOne's overall site plan, grading plan, utility plan, and construction details.

On June 19, CareOne submitted a separate application to the Department for a "Special Activity Transition Area for Stormwater Management." The application, which included a June 2008 version of TWT's "Statement of Compliance," concerned proposed construction on a section of CareOne's property that was part of the transition area associated with freshwater wetlands on the other side of Whitehorse-Hamilton Square Road. Because the offsite wetlands were of exceptional resource value, they required a 150-foot transition area, which extended across

_____

[3] Bioswales are stormwater runoff conveyance systems that provide an alternative to storm sewers.

the road onto CareOne's property.[4]  CareOne provided the required notice to Hamilton Township and adjacent landowners.

Objectors, including appellants and other property owners living in the adjacent Society Hill community, opposed CareOne's proposal.  Their major concerns centered on stormwater management and local flooding risks.  The Department assured them that their concerns would be considered before any approvals were given.

On June 24, appellants' engineer, John A. Miller, P.E., of Princeton Hydro, LLC (Princeton Hydro), sent the Department fourteen detailed objections to CareOne's stormwater control plan.  He opined that the plan would not prevent runoff or the resulting periodic inundation of neighboring properties and downstream pollution.  He pointed to CareOne's lack of conformity with non-structural strategies, peak flow reductions, water quality runoff treatment, maintenance of groundwater recharge, and safety standards.  He asserted that CareOne's design:  (1) failed to address as a primary consideration the use of natural (non-structural) stormwater management techniques, such as "minimizing disturbance, minimizing impervious surfaces, minimizing the use of stormwater pipes,

---

[4]  See N.J.A.C. 7:7A-2.7 (governing transition areas due to freshwater wetlands on adjacent property).

[and] preserving natural drainage features," as required by Departmental regulations; (2) improperly exempted existing impervious groundwater recharge; (3) improperly allowed the post-development rate of runoff to exceed the pre-development runoff rate in at least two locations; (4) failed to consider the recharge capabilities of certain soils, which led to erroneous stormwater calculations; (5) planned to employ manufactured treatment devices that were not effective at reducing nonpoint water pollution; (6) violated safety standards by installing retaining walls around the detention basin; (7) proposed a wetland basin that conflicted with TWT's statements at the zoning board hearing proposing a dry basin; (8) failed to account for runoff from existing wetland after it is filled; (9) relied on onsite soil testing logs that erred in regard to the depth to seasonal high groundwater, understated groundwater levels and overstated recharge, and ultimately understated the amount of stormwater runoff; (10) relied on "test pits" that were not dug to sufficient depths or in the deepest location of the proposed detention basin to verify groundwater depth; (11) relied on a soil survey that contradicted the submitted soil boring logs; (12) relied on a flawed annual groundwater recharge analysis, resulting in the under-assessment of stormwater flows; (13) violated best management practices by failing to test near

the proposed recharge facility; and (14) failed to describe the construction schedule to ensure the maintenance of stormwater controls as the existing basin is being filled.

In addition, appellant Tierney, an adjacent property owner, sent an email to the Department complaining about CareOne's stormwater management plan and the loss of the site's natural resources. She was concerned that CareOne's site plan contained only one stormwater basin:

> My concern with the stormwater basin is based on the fact that [the] property was also once wetlands and we have very wet ground surface for days following rain. In the month of December when a stormwater outlet to our basin was obstructed we had a couple feet of standing water for over 20 days. This standing water shows soils adjacent to CareOne do not provide recharge in a 72 hour period. CareOne's stormwater basin is connected to the area of existing wetlands. . . . I am concerned the increased permeable surface, loss of natural vegetation and surface area and the questionable recharge properties may lead to flooding of adjacent areas and support a mosquito breeding area.

Following receipt of appellants' comments, the Department requested additional information from CareOne, which filed a September 2008 revision of its "Detention Facilities Operation and Maintenance Manual."

On October 7, the Department's staff contacted Princeton Hydro by telephone to discuss CareOne's stormwater design, and

then responded to follow-up emails from Princeton Hydro on November 7 and 13. The staff told Princeton Hydro that CareOne's new basin was not required to be "a 1:1 wetlands replacement" for the existing "wet basin," which CareOne proposed to fill and replace, because the basin had been created under the 1999 permit.

The staff also told Princeton Hydro that filling the existing basin did not need to be part of CareOne's current application, because the Department had "decided that requiring . . . a permit for creating these wetlands and then another permit to fill these same wetlands would be regulating the disturbance twice." That advice, however, was not consistent with the Department's earlier instruction to CareOne, in March 2008, that filling the existing basin and then creating a new basin involving the special transition area of the offsite wetlands required a separate General Permit No. 1 (GP1) wetlands permit "for replacement of this wetland basin."

On November 20, the Department issued CareOne an LOI/Line Verification, specifying the boundary of the freshwater wetlands and waters on the property, including the transition area for the offsite wetlands. Based upon its own site inspection and the information submitted by CareOne, the Department also determined that the onsite wetlands were of "intermediate"

resource value, "isolated and not part of a surface water tributary system."

On the same day, the Department issued CareOne the following approvals: (1) a GP6 permit, which authorized activity involving the filling of 21,800 square feet (0.5 of an acre) and the filling of the existing detention basin, including a transition area waiver for access; (2) a Water Quality Certification; and (3) a Special Activity Transition Area Waiver for Stormwater Management, which authorized disturbing the transition area of the offsite wetlands. As the Department acknowledges, there was no reference to CareOne's stormwater management plan or the agency's review of that plan on the face of those approvals.

The Department published notice of its permit approval in the DEP Bulletin on December 3, and its approval of the special transition area waiver on January 14, 2009. The Department did not mention either a public comment period or the right to seek a hearing for those approvals. However, the permit document itself provided that, "[i]n accordance with N.J.A.C. 7:7A-1.7, any person who is aggrieved by th[e] decision may request a hearing within 30 days after notice of the decision is published in the DEP Bulletin." On January 2, 2009, appellants filed a timely "Adjudicatory Hearing Request" with the Department,

A-2231-08T2

asserting that alleged defects in CareOne's stormwater plan would cause the discharge of large volumes of stormwater onto their properties.

On January 5, appellants appealed the Department's November 2008 decision granting CareOne the GP6, the transition area waivers, and the water quality certificate. That appeal was assigned Docket No. A-2231-08.

On May 7, the Department moved for an order remanding the matter to the Department for additional fact finding. It also sought dismissal of the appeal without prejudice. The purpose of the remand was to address the issue of the stormwater management plan, which, as noted, had not been mentioned on the face of the Department's approvals. The Department's section chief asserted in her supporting certification that she would meet with appellants and their consultant, Princeton Hydro, "to discuss concerns expressed in their submitted comments," and "[i]f the Department conclude[d] that the project . . . meets the Stormwater Management Regulations, the Department shall issue an amended decision setting forth the factual basis for that determination."

On June 22, we granted the Department's motion for remand in Docket No. A-2231-08, but denied its motion to dismiss the appeal. Instead, we retained jurisdiction and ordered

completion of the remand by September 25. We noted that we would allow for "an appropriate extension" of the deadline if the Department needed a "hearing . . . to properly complete th[e] remand." Although we granted extensions at the request of both sides, the Department did not hold a hearing.

In August, Department staff met with appellants and representatives of Princeton Hydro, the Delaware Riverkeeper, and the Delaware Riverkeeper Network.[5] Appellants' counsel also submitted written comments and legal arguments. Department staff subsequently met with CareOne to discuss the objections raised by the project's opponents. In October, CareOne submitted new revisions of its preliminary and final site plan, its drawings, and TWT's "Drainage and Detention Calculations" and "Detention Facilities Operation and Maintenance Manual."

On December 1, Princeton Hydro sent the Department objections to the newly revised plans. It argued that the Department should require CareOne to apply for an individual permit instead of a general permit, because: (1) CareOne's filling, relocating, and enlarging the existing detention basin together with filling the wetlands that had formed in the uplands surrounding that basin since its 1999 construction did

---

[5] We subsequently granted amicus status to the Delaware Riverkeeper and the Delaware Riverkeeper Network.

A-2231-08T2

not fall within the scope of the 1999 permit or qualify for a GP1 under the N.J.A.C. 7:7A-5.1, which states that "[a]ctivities under [GP1] shall not expand, widen or deepen the previously authorized feature"; (2) the wetlands inside the existing basin and the new wetlands created in the uplands could not be considered isolated for GP6 purposes because of the existing discharge pipe connecting them and making them part of a tributary system, and N.J.A.C. 7:7A-5.6 authorizes activities "if the freshwater wetlands . . . are not part of a surface water tributary system"; and (3) CareOne's proposed activities combined with its activities in the existing basin and associated wetlands exceeded the one-acre limit for a GP6 and did not qualify for an exception under N.J.A.C. 7:7A-4.4(a).

On January 26, 2010, the Department submitted a fact-finding remand report, entitled "Engineering and Environmental Report," to the Clerk of the Appellate Division. In the remand report, the Department explained that "a number of revisions were made to the proposed design of the site and the stormwater management calculations by design engineer Gary Vecchio, P.E., as requested by the Department."

> The Nonstructural Strategies Point System (NSPS) spreadsheet has been revised to demonstrate that the project complies with the requirements of N.J.A.C. 7:8-5.3. Various adjustments were made to the runoff and recharge calculations, based on revised

> assumptions of soil types and drainage
> areas. Additionally, the proposed water
> quality treatment devices were modified as
> requested, so that only the water quality
> design storm, which is 1.25 inches of rain
> in a two-hour period, as defined at N.J.A.C.
> 7:8-5.5(a) will be treated. Modifications
> were also made to the stormwater management
> operation and maintenance manual, a
> construction sequence was provided, and
> runoff to depressed areas onsite was
> reevaluated.

However, the Department informed us that CareOne still needed to make additional design alterations to address Princeton Hydro's December 2009 concerns "with which the Department is in agreement."

More specifically, the Department agreed that (1) CareOne's new inlet proposed for Whitehorse-Hamilton Square Road also conveyed water into the proposed new detention basin, and that CareOne had not included those runoff projections in its calculations for the basin's capacity; (2) CareOne's design assumed the wrong soil type in its stormwater calculations in contradiction to the soil borings, and underestimated and underreported the difference in runoff quantities, "resulting in additional runoff downstream that is unaccounted for in the submitted calculations"; (3) CareOne did not provide proof that its proposed storm sewer system could carry stormwater into the proposed new detention basin during a hundred-year storm, or that the basin would function properly and not back up during

this storm; (4) CareOne's operation and maintenance manual did not address goose and invasive species control; (5) there was a contradiction between CareOne's submitted materials and a detail sheet regarding maintenance methods for the proposed StormChambers infiltration units; (6) CareOne needed to conduct "[a]dditional field work . . . to verify the functionality of the proposed hybrid basin, given that the seed mixture proposed on the plans for the 'wet' bottom of the basin is highly dependent on the soils being saturated"; (7) CareOne's stormwater calculations failed to compute drainage times "necessary to verify that storage exists for the next storm event"; (8) that, based on submitted soil boring logs, the system near one of the test pits "could be influenced by a perched water table, which would surcharge the area and overwhelm the proposed facility"; and (9) CareOne needed to address Princeton Hydro's conclusion that the "Groundwater Recharge Trench" to the StormChambers "does not satisfy the Stormwater Rule design standards."

The Department further advised us that, after addressing those issues, CareOne would need to "apply for a modification of the freshwater wetlands permits in order to formalize the Department's review and approval of these changes." The Department also asked Princeton Hydro to provide engineering

calculations for "further illumination . . . regarding runoff from adjacent properties," adding that, based on the information, it might require CareOne to make "further amendments to the stormwater management design of th[e] project."

On March 10, the Department's Acting Commissioner denied appellants' request for an adjudicatory hearing, finding that they had "demonstrated neither a risk of erroneous deprivation of a particularized property right nor any statutory right to an administrative hearing." On April 26, appellants filed a notice of appeal with respect to the denial of their hearing request. That matter was assigned Docket No. A-3837-09.[6]

On August 30, in response to the Department's remand report, CareOne submitted revised plans and drawings to the Department. These included (1) revised preliminary and final site plans; (2) revised drawings for existing and proposed drainage areas; (3) revised "Drainage and Detention Calculations"; and (4) a new version of TWT's "Detention Facilities Operation and Maintenance Manual." In those documents, CareOne proposed two new groundwater recharge areas that, based on its new soil borings and permeability tests, will

---

[6] On the same day, appellants filed a motion for summary disposition in Docket No. A-2231-08. That motion was denied on June 8.

"completely drain" in 3.3 hours and 7.3 hours, respectively, which was less than the recharge volume required within seventy-two hours. CareOne also reported that it had performed another soil boring "to make sure the invert of basin . . . has at minimum a 1" separation from the seasonal high water table." Based on those results and its revised conditions, drainage, and detention calculations, CareOne concluded that "the total annual recharge volume will be greater than the post-development annual recharge deficit, and it added that a proposed new "Emergency Spillway" will "convey flow[s] of the 100-year inflow peak [plus] 50%."

In a February 1, 2011 letter to CareOne concerning the 2008-approved GP6 and transition area waivers, the Department stated in part:

> As a result of the pending appeal of the above permits, the State requested that the Appellate Division remand these permits back to the Department for reconsideration. Since that time, the Department reviewed concerns raised by objectors, reviewed additional information submitted by the permittee's consultant [TWT], as noted below, and <u>has determined that it is necessary and appropriate to issue a modified permit</u>.
>
> [(Emphasis added).]

The Department's letter listed information and documents it had reviewed, which included (1) Princeton Hydro's June 2008

comments; (2) CareOne's revised drawings, calculations, and manuals prepared by TWT in October 2009; (3) Princeton Hydro's December 2009 comments to the new revisions; and (4) CareOne's subsequently revised drawings, calculations and manuals prepared by TWT in July 2010, and submitted to the Department in August 2010.

The Department's letter continued:

> This <u>modification letter</u> approves:
>
> 1. At the Department's request, a safety fence is now to be installed around the perimeter of the entire detention basin. This is necessary since the detention basin design includes small retaining walls in place of earthen slopes along the outer edges of the detention basin.
>
> 2. The relocation of manufactured water quality treatment devices which are to be located connected and adjoining to the storm water pipes. Constructing these devices adjacent to stormwater pipes allows larger storm flows to by-pass the water quality devices which makes them more efficient in treating water quality.
>
> 3. Groundwater recharge chambers are to be relocated. This is necessary since the chambers were previously proposed in an area where soils are not permeable enough to provide adequate groundwater recharge.
>
> [(Emphasis added).]

The modification letter also approved various drawings as revised by TWT, including a new site plan, grading plan, utility

A-2231-08T2

plan, profiles, construction details, and basin construction sequence plan.

However, the Department noted that

> [t]his approval is subject to the following conditions:
>
> 1. The applicant [CareOne] is required to provide a revised Groundwater Recharge Spread Sheet (NJGRS) and confirm that the soil types determined by field infiltration tests were used in the recharge spread sheets, where appropriate. If the project does not provide adequate recharge in the proposed condition, additional recharge structures must be provided.
>
> 2. The applicant [CareOne] is required to seed the basin with a grass seed mixture of wet tolerant and dry tolerant varieties. Therefore, a revised Landscape Map must be submitted reflecting this change.
>
> All required information must be submitted to this office within 60 days of receipt of this letter. Furthermore, <u>no disturbance or construction may be undertaken in regulated areas until the permittee has submitted the required information and received a written approval of the same from the Department. All other conditions of the original permit remain in force, and this revision does not extend the original permit expiration date</u>.
>
> [(Emphasis added).]

At the same time, the Department's staff issued two new reports, both dated February 1: (1) a new "Engineer's Report for SWM review" with supporting calculations; and (2) a new "Engineering and Environmental Report."

In its new SWM review report, the Department staff found that, because CareOne's "[o]verall proposed land disturbance is more than 1 acre and new impervious area is more than 1/4 acre," "review of stormwater management was required for this project." Having reviewed CareOne's most recent submissions and calculations, it recommended "approval." The staff also accepted CareOne's proposed TSS removal rate and found that CareOne's operation and maintenance manual was in accordance with N.J.A.C. 7:8-5.8. Finally, the report noted the receipt of objection letters from Princeton Hydro for CareOne's "original stormwater design," after which "[t]he revised stormwater management report and plans were reviewed twice by the objector's engineer and no comments were received for this revision."

The Department's revised "Engineering and Environmental Report," contained the following findings: (1) CareOne had included a proposed inlet on Whitehorse-Hamilton Square Road in its basin inflow/outflow calculations, which satisfied the Department's concern that "the basin calculations count all of the runoff from the impervious areas"; (2) CareOne had relocated its proposed groundwater recharge, giving the project "9,000 cubic feet of groundwater recharge beyond what was provided in the originally approved design," but the Department still needed

CareOne to verify that it had "not underestimated existing groundwater recharge on the site"; (3) CareOne "ha[d] now analyzed the proposed storm sewer system based on a 25-year storm event and a 100-year storm event, and ha[d] demonstrated that the proposed system has adequate capacity," and that if the storm pipes got backed up, "the majority of any overflow from catch basins [would] still enter the detention basin by overland flow"; (4) CareOne had revised its "Detention Facilities Operation and Maintenance Manual" to provide for invasive plant species and goose control, along with "an acceptable maintenance protocol for the proposed StormChamber infiltration units"; (5) CareOne would "be required to seed the basin with a grass seed mixture consisting of wet tolerant and dry tolerant varieties," ensuring the grass would survive; (6) CareOne had revised its plans to include new drainage time calculations, "which demonstrate[d] that the proposed drainage-times are less than 72 hours," and had provided a new test pit "at the exact location of the recharge system," which showed "that location is not influenced by a perched water table" and that groundwater "was not encountered [anywhere] down to a depth . . . more than 2 feet below the bottom of recharge facility"; and (7) CareOne had relocated its recharge areas to different locations above the seasonal high groundwater table, which satisfied the

Department's concern that CareOne's proposed trench did not meet SWM design standards.

The Department concluded:

> As a result of the objector's claim[s], the applicant's consultant [TWT] has now revised plans and stormwater management report as submitted to the [Department] on August 30, 2010 to address the groundwater recharge, details of the recharge chambers and water quality bypass. The applicant's consultant also verified the depth of the groundwater where claims were made regarding inadequate documentation. The revised project meets all of the stormwater management regulations subject to the conditions listed in the revised approval letter.

Finally, the Department reiterated that "no additional comments were received from the Objector's consultant."

On February 15, Princeton Hydro submitted updated comments and objections concerning CareOne's August 2010 plans, reports, and drawings to the Department. According to Princeton Hydro, it "had not known about" TWT's August submissions to the Department until the Department's staff had contacted Miller on November 29.

On February 16, the Department moved to dismiss Docket No. A-2231-08 as moot, and CareOne joined in the motion. On March 17, we reserved decision on the Department's motion to dismiss, pending determination on the merits of the appeal.

A-2231-08T2

In the March 9 DEP Bulletin, the Department published a "NOTICE OF INTENT TO SETTLE" based on its most recent correspondence to CareOne. The notice provided as follows:

On February 1, 2011[,] a revision letter was issued to the applicant Care One for the previously approved Freshwater Wetlands Transition Area Waiver for Stormwater Management and General Permit No. 6. . . .

The revision letter approves:

(1) A safety fence to be constructed around the perimeter of the entire detention basin.

(2) The relocation of manufactured water quality treatment devices which are to be located connected and adjoining to storm water pipes.

(3) Groundwater recharge chambers are to be relocated.

The applicant is still required to submit the following information:

(1) A revised Groundwater Recharge Spread Sheet (NJGRS) must be submitted and if not acceptable additional recharge structures must be provided.

(2) A revised Landscape Map must be submitted showing the basin is seeded with a grass seed mixture of wet tolerant and dry tolerant varieties.

Seven (7) drawings prepared by Taylor, Wiseman and Taylor, dated March 30, 2007 and last revised July 30, 2010 were approved with this revision.

The notice further provided that "[a]ny comments, concerning this revision, must be submitted within 15 days to [the Department]."

On March 18, appellants filed a notice of appeal from the Department's February 1, 2011 decision, which they characterized as "a revised permit." That matter was assigned Docket No. A-3400-10.[7]

In March, CareOne submitted additional revisions to the Department in response to the two conditions in its February 1 letter. In a letter dated April 20, the Department confirmed that CareOne had satisfied those conditions. The Department found that "[t]he project now complies with the Stormwater Management Regulations, N.J.A.C. 7:8." The Department published notice of its April 20 letter in the May 11 DEP Bulletin under the heading "NOTICE OF INTENT TO SETTLE AND ISSUE PERMIT." The notice referred to the fifteen-day public comment period.

In June, the Department filed its fourth statement of items comprising the record. In July, appellants filed a motion to correct the administrative record by adding an April 8 letter they contend Princeton Hydro sent to the Department concerning

---

[7] In April, CareOne moved to consolidate the three appeals and appellants moved to stay any construction pending appeal. We granted the consolidation motion in May, but denied the request for a stay.

objections to the Department's revision letter. While the motion was pending, the Department filed its fifth statement, which included other items received by the Department after February 1, but did not include the April 8 letter from Princeton Hydro.

We initially denied appellants' motion to supplement, but on reconsideration reserved the issue pending a decision on the merits. We observed that

> [i]t is not clear from the motion that the document at issue was filed with [the Department] when it made the decision as to which there is an appeal pending or whether [the Department] has included in its statement of the record of appeal other documents that were received by it following such decision. Consequently, we defer the issue to the merits panel. Movant may include the document in its appendix and comment on it in argument, subject to the decision of the merits panel whether to consider the document.

Because the Department published its April 20 letter as a notice of intent to settle in the May 11 <u>DEP Bulletin</u>, we grant appellants' motion to include Princeton Hydro's April 8 letter in the record on appeal.

In that letter, Princeton Hydro wrote:

> There are a number of disconcerting items that [the Department] has failed to recognize through this lengthy and abnormal process. The point system that [the Department] is relying on to confirm the applicant has satisfied the Rule's non-

structural strategies is not part of the Stormwater Rule or BMP manual and did not go through a formal adoption process. The [Department] accepted a fence in lieu of meeting the Safety Standards for Stormwater Management Basins (N.J.A.C. 7:8-6.2(c)3) and the Municipal Land Use Law, [N.J.S.A.] 40:55D-95.1, endangering the public. Further, [the Department] relied on a Certification Letter from the applicant's engineer for soils data and groundwater recharge design rather than evaluating the conclusions and integrity of design. Equally important to the defects in the application with regard to the Stormwater Rule, the [Department] has completely ignored the wetland permitting issues discussed in the September 10, 2009 meeting with [the Department] followed by a Princeton Hydro letter on December 1, 2009 to [the Department].

Continued nonconformance is fully described in a Princeton Hydro review letter dated February 15, 2011 submitted to your office. This letter details the persistent lack of conformity with non-structural strategies, peak flow reductions, water quality runoff treatment, maintenance of groundwater recharge and satisfying safety standards. The February 1, 2011 letter to modify the permit is seemingly based on the content of a [Department] Engineering and Environmental Report dated February 1, 2011. After much time and commenting to the [Department], the conditions assigned to the modified permit, requiring additional information to be submitted, acknowledges the further failure of the applicant to comply with the Rules. The original permit had no such required conditions to supply additional information. In fact, with these conditions of approval, the modified permit is additionally flawed since it will require the submission of additional information, and this being critical information to

verify compliance with the Stormwater Rule. If additional recharge facilities are required, additional soil testing will also be necessary. Even if the conditions are met, there are a number of outstanding comments, detailed in Princeton Hydro's February 15, 2011 letter. The continual unconventional [Department] review process will further the cycle of revisions, reviews and more comments into the foreseeable future and beyond.

With the Princeton Hydro June 24, 2008 letter, [the Department] should not have issued a permit and, on a technical level, [should] have realized this in its first Engineering and Environmental Report dated January 26, 2010. After a permit was issued and following a September 10, 2009 meeting with [the Department] and Princeton Hydro letter dated December 1, 2009 to [the Department], [the Department] should have rescinded the permit. As the February 15, 2011 Princeton Hydro letter demonstrates, the modified permit, like the original, is flawed and should have been held, or as now issued, rescinded.

II.

Before turning to the substantive issues raised on this appeal, we first address the motion to dismiss that was reserved pending our consideration of the merits.

The Department and CareOne seek dismissal of Docket No. A-2231-08, the appeal concerning the Department's 2008 permit and related approvals, arguing that the issue is moot because the 2008 permit was superseded by the subsequent modifications that are the subject of the appeal in Docket No. 3400-10. Our

29

problem with respondents' argument is that the Department never took final administrative action with respect to those modifications. See N.J.A.C. 7:7a-14.1(a) and -14.3 (modifying an issued permit).

In both instances, the Department published notices of intent to settle, which triggered public comment periods. However, the Department took no formal action to adopt the modifications after the close of the comment period. See, e.g., Dragon v. N.J. Dep't of Envtl. Prot., 405 N.J. Super. 478, 492 (App. Div.) (discouraging use of agency's settlement power to avoid regulatory compliance), certif. denied, 199 N.J. 517 (2009).[8] Because there was no final administrative action, the appeal in Docket No. 3400-10 is interlocutory.

As a result, we deny the motion to dismiss Docket No. A-2231-08 and instead dismiss Docket No. 3400-10 as interlocutory. Inasmuch as the issues have been fully briefed and argued, we reluctantly consider the subsequent actions taken to have been a consequence of our 2009 remand and, therefore, included in the earlier appeal in Docket No. A-2231-08.

Nevertheless, we note the Department's continuing modification of the permit and other approvals long after the

---

[8] We again caution against the use of a notice of settlement to avoid regulatory compliance.

expiration of the remand period was inappropriate. Once it had determined that the information on which the 2008 approvals were issued was inaccurate or insufficient, the better practice would have been to withdraw the permit pending further review of the applications. Once it had finalized the approvals, it should have reissued them, as revised, with appropriate notice, publication, and compliance with administrative procedures.

### III.

We now turn to the merits of the appeal, starting with the issue raised in Docket No. A-3837-09 concerning the Acting Commissioner's denial of the appellants' request for an adjudicatory hearing.

A third-party objector's right to a formal administrative hearing is delineated and circumscribed by the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -25. Although "the APA does not foreclose such third parties from seeking judicial review of the merits of a permit once it is issued by an agency," In re Riverview Dev., LLC, 411 N.J. Super. 409, 425 (App. Div.), certif. denied, 202 N.J. 347 (2010), it gives the non-applicant objector no automatic right to a formal administrative hearing to contest the issuance of a permit unless he or she can establish a statutory or constitutional right to that hearing. In re NJPDES Permit No. NJ0025241, 185

N.J. 474, 481 (2006); <u>In re Freshwater Wetlands Statewide Gen. Permits</u>, 185 <u>N.J.</u> 452, 463 (2006); <u>Spalt v. N.J. Dep't of Envtl. Prot.</u>, 237 <u>N.J. Super.</u> 206, 212 (App. Div. 1989), <u>certif. denied</u>, 122 <u>N.J.</u> 140 (1990). In fact, the APA expressly prohibits a state agency from promulgating rules or regulations entitling a third party to an administrative appeal as a contested case under the APA unless "specifically authorized to do so by federal law or State statute," or unless a person "has [a] particularized interest sufficient to require a hearing on constitutional or statutory grounds." <u>N.J.S.A.</u> 52:14B-3.1(d), -3.2(c), -3.3.

The Freshwater Wetlands Protection Act (FWPA), <u>N.J.S.A.</u> 13:9B-1 to -30, does not provide third-party objectors with the right to a plenary administrative hearing to challenge DEP's issuance of a permit. Under <u>N.J.S.A.</u> 13:9B-20, only applicants may request an adjudicatory hearing to challenge the Department's decision concerning a FWPA permit. Consequently, appellants' challenge to the Department's action does not qualify for an adjudicatory hearing unless they establish that one or more of their constitutional rights are at stake.

In rejecting appellants' request, which was premised on CareOne's project posing a threat of increased stormwater discharge to their properties, the Acting Commissioner relied on

In re Freshwater Wetlands, supra, 185 N.J. at 470. In that case, the Supreme Court, referring to our decision in Spalt, supra, 237 N.J. Super. at 212, observed that

> Judge (later Justice) Coleman held that "simply because some of the plaintiffs reside close to the proposed [marina] site and are fearful of resultant injury to their property, does not mean they are entitled to an adjudicatory hearing." Further elaborating on that theme, Judge Coleman noted that "[f]ear of damage to one's recreational interest or generalized property rights shared with other property owners is insufficient to demonstrate a particularized property right or other special interest."
>
> [In re Freshwater Wetlands, supra, 185 N.J. at 470 (citations omitted).]

Appellants presented only their fears of flooding and Princeton Hydro's calculations evidencing the possibility of flooding on neighboring properties from CareOne's project. We find no error in the Acting Commissioner's determination that appellants "have not demonstrated a particularized property right which gives rise to a constitutional basis for granting a hearing."

Consequently, we affirm the denial of appellants' request for an adjudicatory hearing.

IV.

We next address appellants' argument that the Department's reliance on the Nonstructural Strategies Points System to assess

33

CareOne's stormwater management plan was improper because implementation of the NSPS constituted improper administrative rulemaking.[9] Before addressing their argument, however, we must supply some background, including the Department's general stormwater management requirements and its incorporation of the NSPS into its permitting process under the FWPA.

Pursuant to N.J.A.C. 7:7A-2.11, all projects requiring an FWPA individual permit and all regulated activities requiring an FWPA general permit that propose to disturb one or more acres are considered "major development[s]" under N.J.A.C. 7:8-1.2, and trigger compliance with the Department's stormwater management rules, found at N.J.A.C. 7:8-1.1 to -6.3. The same requirement applies to a project that would increase impervious surfaces by one-quarter acre (10,890 square feet) or more. N.J.A.C. 7:7A-2.11, 7:8-1.2.

Subchapter 5 of those rules, N.J.A.C. 7:8-5.1 to -5.9, sets standards for limiting the "adverse impact of stormwater runoff." N.J.A.C. 7:8-5.1(a). Standards for controlling erosion, encouraging and controlling infiltration and

---

[9] Although it is not clear that the issue was directly argued before the Department, no party has raised that issue, and they have addressed the merits of the argument. Consequently, we need not reach that question.

A-2231-08T2

groundwater recharge, and controlling runoff quantities are found in N.J.A.C. 7:8-5.4. Standards for runoff quality are found in N.J.A.C. 7:8-5.5. The regulations provide that the standards in those two regulations "shall be met by incorporating nonstructural stormwater management strategies at N.J.A.C. 7:8-5.3 into the design" "[t]o the maximum extent practicable." N.J.A.C. 7:8-5.2(a), -5.3(a) (emphasis added). The nine specific nonstructural strategies that "shall" be incorporated into every site design to "the maximum extent practicable" are listed in N.J.A.C. 7:8-5.3(b).

In addition, all permit applicants "shall identify the nonstructural strategies incorporated into the design of the project." N.J.A.C. 7:8-5.3(a) (emphasis added). "If the applicant contends that it is not feasible for engineering, environmental or safety reasons to incorporate any nonstructural stormwater management strategies identified in [N.J.A.C. 7:8-5.3(b)] . . . into the design of a particular project, the applicant shall identify the strategy and provide a basis for the contention." Ibid. (emphasis added). It is only when the standards in N.J.A.C. 7:8-5.4 and -5.5 cannot be met by nonstructural measures alone that "structural stormwater management measures . . . necessary to meet these standards shall be incorporated into the design." N.J.A.C. 7:8-5.2(a).

A-2231-08T2

Consequently, the Department's regulations require applicants for major developments, such as CareOne, to demonstrate that, to the "maximum extent practicable," they gave nonstructural stormwater strategies, such as swales or bioretention basins, priority over structural stormwater strategies, such as storm sewers, pipes, and manufactured treatment devices. If they cannot do so, they must prove why such priority was not feasible for engineering, environmental or safety reasons.[10]

When the Department proposed its current stormwater management rules in 2003, 35 N.J.R. 119(a) (Jan. 6, 2003), commenters requested "a definition" of "maximum extent practicable," 36 N.J.R. 670(a), 691 (comments 185-86) (Feb. 2, 2004). The Department responded that the term is "fact-sensitive and cannot be reduced to a standard formula. The reviewing agency's administrative discretion in determining compliance with these rules will be guided by the goals of this chapter and its statutory mandates." Ibid. The Department explained that the term was "used to describe the expenditure of effort required to achieve full compliance with the applicable

---

[10] The Department provides extensive guidance concerning nonstructural stormwater management strategies. See N.J.A.C. 7:8-5.3(d), -5.9.

standard, taking into account the specific circumstances of the development in question." Ibid.

Commenters further noted that neither the proposed rules nor the New Jersey Stormwater Best Management Practices (BMP) Manual "include[d] any specifics as to how can one calculate the effectiveness of the nonstructural measures incorporated into the site design as required under N.J.A.C. 7:8-5.3." Id. at 719-20 (comments 473-75). The Department responded:

> Calculations are performed based upon computational methods referenced in N.J.A.C. 7:8-5.4(a)2i and 5.6. The factors that are utilized in the calculations depend upon the nonstructural stormwater strategy and the site-specific conditions. . . . The BMP Manual provides guidance on how to adjust computations based on the nonstructural stormwater BMPs implemented. Because the calculations depend on varying site-specific conditions, the Department does not believe that the formation of a table is appropriate.
>
> The applicant's engineer must demonstrate and discuss the use of nonstructural stormwater management techniques throughout a proposed development site to demonstrate where each technique is utilized. In cases where specific techniques are not used, the applicant's engineer must provide the justification. A checklist is included in the BMP Manual to assist designers to address this requirement.
>
> [Id. at 720.]

In 2006, however, the Department created the NSPS, described in the NSPS User's Guide as "a tool to <u>assist</u> planners, designers, and regulators in determining that the strategies have been used to the 'maximum extent practicable' at a major development as required by the Rules" (emphasis added). It posted the NSPS User's Guide and the NSPS Excel Spreadsheet on its website, along with other guidance documents and responses to "Frequently Asked Questions" relating to its stormwater management rules.[11]

According to the NSPS User's Guide (emphasis added):

> The New Jersey NSPS is a Microsoft Excel-based computer spreadsheet program that can be used to demonstrate that <u>sufficient</u> nonstructural stormwater management measures have been incorporated into the design of a major land development project to . . . meet <u>the maximum extent practicable requirement</u> for nonstructural strategies in the Stormwater Management Rules. The NSPS assigns points based upon the existing and proposed conditions at the development site. A specific percentage of existing or pre-developed points must be achieved under proposed or post-developed conditions in order to demonstrate compliance through the NSPS. As described in detail below, the required percentage of existing points varies according to the size of project site and the State Planning Area in which it is located.

---

[11] <u>See</u> N.J. Dep't of Envtl. Prot., <u>Stormwater Management: Additional Guidance Documents</u>, http://www.njstormwater.org/ guidance.htm (last visited Aug. 5, 2013).

A-2231-08T2

Appellants argue that the NSPS has the effect of an administrative rule and should have been adopted through the formal rulemaking process. Both the Department and CareOne argue that formal APA rulemaking is not required because the Department is entitled to take informal action to advise and supervise the regulated community, such as creating the NSPS and using it to review permit and waiver applications. They assert that the NSPS provides no new substantive legal or administrative standard or policy that cannot be inferred from the existing stormwater management rules. Respondents further maintain that use of the NSPS is not "mandatory" or "dispositive." Instead, they contend that the NSPS "merely serves as a screening device to streamline review." They aver that it is only "one way" for the agency to review a project's nonstructural features, providing only a preliminary screen for minimal compliance with N.J.A.C. 7:8-5.3 standards without "eliminate[ing] case-specific departmental review of a stormwater plan."

Respondents' argument is fatally undercut by the Department's own "Important Note" in the NSPS User's Guide.

> Important Note: If the NSPS demonstrates that sufficient nonstructural stormwater management measures have been utilized at a major development, no further proof of compliance with the maximum extent practicable requirement shall be required.

However, if the NSPS fails to demonstrate such compliance, such results shall not be used to disapprove any permit application sought by a proposed major development. Instead, the applicant for such permit will be required to demonstrate compliance through other and/or additional means. This includes the Low Impact Development (LID) Checklist contained in Appendix A of the <u>New Jersey Stormwater Best Management Practices Manual</u>, which includes a rigorous alternatives analysis for each measure. Finally, it should be noted that the NSPS is not presently intended for use on roadway construction, improvement, and other linear development projects. As a result, other means, including the LID Checklist, should be used for such projects.

[(Emphasis added).]

It is clear from the language used by the Department itself that its review of the use of nonstructural measures does not go beyond the NSPS if the minimum number of points have been awarded to satisfy the "sufficient" standard, without determining whether the use of additional nonstructural measures would have been practicable. In contrast, failure to use the NSPS or to reach the required "sufficient" score will result in "a rigorous alternatives analysis for each measure." Such an application of the NSPS conflicts with the Department's own assertion, during promulgation of its stormwater management regulations, that the term "maximum extent practicable" found in <u>N.J.A.C.</u> 7:8-5.3 is "fact-sensitive and cannot be reduced to a standard formula." 36 <u>N.J.R.</u> at 691 (response to comments 185-

86). Indeed, the Department asserted that "[b]ecause the calculations depend on varying site-specific conditions, the Department does not believe that the formation of a table is appropriate." Id. at 720 (response to comments 473-76).

Appellants argue that the use of the NSPS, as described by the Department, improperly shortcuts the application review process because it has not been subjected to the rulemaking process and its opportunity for public comment. We agree.

Administrative agencies possess wide latitude in selecting the appropriate procedures to effectuate their regulatory duties and statutory goals. In re Request for Solid Waste Util. Customer Lists, 106 N.J. 508, 519 (1987); Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 333 (1984); Texter v. Dep't of Human Servs., 88 N.J. 376, 383-84 (1982). However, an agency's "discretion to act formally or informally is not absolute." In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 133 (App. Div. 2013) (petition for certification pending).

"The inquiry whether an agency's actions constitute improper rulemaking is informed by well-settled principles." Ibid. Guidance documents, standardized forms, and responses to "frequently asked questions" can constitute improper rulemaking. Id. at 112-14, 138-40.

The APA defines an administrative rule as an agency's "statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements" of the agency. N.J.S.A. 52:14B-2(e). "If an agency determination or action constitutes an 'administrative rule,' then its validity requires compliance with the specific procedures of the APA that control the promulgation of rules." Airwork Serv. Div. v. Dir., Div. of Taxation, 97 N.J. 290, 300 (1984), cert. denied, 471 U.S. 1127, 105 S. Ct. 2662, 86 L. Ed. 2d 278 (1985).

Formal rulemaking "allows the agency to further the policy goals of legislation by developing coherent and rational codes of conduct 'so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance.'" Gen. Assembly of N.J. v. Byrne, 90 N.J. 376, 385-86 (1982) (quoting Boller Beverages, Inc. v. Davis, 38 N.J. 138, 152 (1962)). "The purpose of the APA rulemaking procedures is 'to give those affected by the proposed rule an opportunity to participate in the process, both to ensure fairness and also to inform regulators of consequences which they may not have anticipated.'" In re Provision of Basic Generation Serv. for Period Beginning June 1[,] 2008, 205 N.J. 339, 349 (2011) (quoting In re Adoption of 2003 Low Income Hous. Tax Credit

Qualified Allocation Plan, 369 <u>N.J. Super.</u> 2, 43 (App. Div.),

<u>certif. denied</u>, 182 <u>N.J.</u> 141 (2004)).

The Supreme Court has identified six factors to consider when evaluating whether an agency's action, "to be valid, had to comply with the requirements governing the promulgation of administrative rules as provided by the APA."   <u>Metromedia</u>, <u>supra</u>, 97 <u>N.J.</u> at 328.

> [A]n agency determination must be considered
> an administrative rule when all or most of
> the relevant features of administrative
> rules are present and preponderate in favor
> of the rule-making process.   Such a
> conclusion would be warranted if it appears
> that the agency determination, in many or
> most of the following circumstances, (1) is
> intended to have wide coverage encompassing
> a large segment of the regulated or general
> public, rather than an individual or a
> narrow select group; (2) is intended to be
> applied generally and uniformly to all
> similarly situated persons; (3) is designed
> to operate only in future cases, that is,
> prospectively; (4) prescribes a legal
> standard or directive that is not otherwise
> expressly provided by or clearly and
> obviously inferable from the enabling
> statutory authorization; (5) reflects an
> administrative policy that (i) was not
> previously expressed in any official and
> explicit agency determination, adjudication
> or rule, or (ii) constitutes a material and
> significant change from a clear, past agency
> position on the identical subject matter;
> and (6) reflects a decision on
> administrative regulatory policy in the
> nature of the interpretation of law or
> general policy.   These relevant factors can,
> either singly or in combination, determine
> in a given case whether the essential agency

action must be rendered through rule-making
or adjudication.

[Id. at 331-32.]

Although the Court formulated those factors in the context of distinguishing rulemaking from adjudication, they also provide a test for determining when rulemaking procedures are necessary to validate agency actions or determinations. Woodland Private Study Grp. v. N.J. Dep't of Envtl. Prot., 109 N.J. 62, 68 (1987). "[T]he factors are relevant whenever the authority of an agency to act without conforming to the formal rulemaking requirements is questioned." Doe v. Poritz, 142 N.J. 1, 97 (1995). They "need not be given the same weight, and some factors will clearly be more relevant in a given situation than others." Ibid. "The pertinent evaluation focuses on the importance and weight of each factor, and is not based on a quantitative compilation of the number of factors which weigh for or against labeling the agency determination as a rule." In re Provision of Basic Generation Serv., supra, 205 N.J. at 350.

We are satisfied that the NSPS and its User's Guide meet all of the Metromedia factors. The use or non-use of the NSPS, as well as the achievement of or failure to obtain the required minimum points on the NSPS, directly affects the Department's review of all applications covered by the "maximum extent possible" requirement. In fact, avoidance of the "rigorous

44

review" resulting from failure to use the NSPS provides a clear incentive for its use. The NSPS is intended for ongoing use, and is not an adjudicative decision or application of a procedure under limited circumstances. It establishes a standard for application submissions and agency evaluations that is not otherwise expressly provided by or obviously inferable from the Department's stormwater management rules or from any statute or other regulation. It constitutes a material and significant change from what applicants are required to submit as to nonstructural stormwater management strategies under N.J.A.C. 7:8-5.3(a). As already noted, it also represents a significant change from the Department's own position at the time it adopted the regulation, when it specifically rejected suggestions that it create a formula because compliance with those requirements is a "fact-sensitive" determination. Finally, creating a fixed formula for assigning NSPS points and percentages reflects a decision on regulatory policy not found in regulations adopted through the APA.

We conclude that the Department's use of and reliance on NSPS in connection with its evaluation of CareOne's applications was impermissible because the NSPS procedure was not the subject

of formal rulemaking.[12]  Consequently, in Docket No. A-2231-08, we reverse the Department's approval of the applications, as well as its issuance and modification of permits and related approvals.

We affirm in Docket No. A-3837-09, and dismiss Docket No. A-3400-10 as interlocutory.  We remand the matter to the Department for further proceedings consistent with this opinion. For that reason, we need not consider any of the remaining points raised on appeal.

Affirmed in part, reversed in part, dismissed in part, and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[12] We express no opinion, one way or another, concerning the propriety of the use of the NSPS should the Department adopt it through formal rulemaking.  We note that, in the context of the Delaware and Raritan Canal State Park Law of 1974 (N.J.S.A. 13:13A-1 to -15), the Department employed the APA's rulemaking procedure to provide for use of the NSPS as an evaluative tool. See N.J.A.C. 7:45-8.2(a)(16) and -8.4(a), (c).